### STATE v. PAUL POELAERT.[1]

May 21, 1937.

No. 31,189.

[1]Reported in 273 N. W. 641.

*Frank E. Dougherty, John W. Flynn,* and *B. E. Grottum,* for appellant.

*William S. Ervin,* Attorney General, *Roy C. Frank,* Assistant Attorney General, and *Warren P. Adams,* County Attorney, for the State.

GALLAGHER, CHIEF JUSTICE.

Defendant was charged with murder in the first degree and convicted of murder in the second degree by a jury in Jackson county. From an order denying his motion for a new trial and from the judgment entered in said action this appeal was taken.

The defendant, Paul Poelaert, was charged in the indictment with having murdered his wife, Mary, on February 11, 1936. Similar charges were pending against him for the murder of his mother, Marie Poelaert, and his two children, Paul, Jr., and Leo, on the same date.

Poelaert, who was 39 years of age, resided on a 320-acre farm in Jackson county with his wife and the other persons referred to. Mary, his wife, was 36 years of age; Marie, his mother, was 75 years of age, and the children, Paul, Jr., and Leo, were respectively of the ages of two years and seven months. Theodore Alt, a hired man, was a member of the household at the time of the tragic events involved herein and had been for about two years prior thereto. He was a man 64 years old.

On the day in question Alt did some work at the straw pile near the barn after eating his noonday meal. About an hour later he entered the barn and found Poelaert holding a handkerchief over a wound on his head. Poelaert asked him to get some help. Alt suspected that something serious had happened and upon leaving the barn noticed black smoke coming out of the chimney on the house. He then went to the home of a neighbor to summon help. Upon his return about half an hour later he discovered that the house was on fire and a portion of it was destroyed. Some of the neighbors had assembled before Alt's return. He informed them that Poelaert was in the barn, and upon entry they found him in a wounded condition but were unable to get any information from him as to what had happened. Arrangements were made as soon as possible, and Poelaert was taken to Jackson to a hospital. His attitude at the hospital will be hereinafter referred to, as well as his attitude toward his wife for sometime prior to her death.

Two neighbors, Emil Kolander and Clarence Nelson, were the first to arrive after Alt left to summon help. They were attracted to the place by the appearance of smoke. Deep snow and extremely cold weather hampered them as well as other neighbors in hurriedly rendering aid. The house was on fire when they arrived, and they were unable to get any response from the occupants. Further details as to the fire would not be helpful. Suffice to say that the house was totally destroyed. A large number of bone fragments were found in the ashes. Bones identified as the charred pelves of two adults were found, also pieces of leg bones, and other evidences that the occupants of the house were all dead.

The chief witness for the state was Theodore Alt, the hired man. He testified in substance that defendant over-indulged in the use of intoxicating liquor; that he frequently quarreled with his wife, particularly when he was intoxicated; that on two or three occasions shortly before her death he heard defendant threaten to kill his wife, and that several times at night he had heard the wife call for help, saying "Paul is killing me." Alt further testified that on one occasion after defendant and his wife had quarreled and shortly before her death defendant said to Alt, "If anything goes wrong

what side will you take," to which the latter replied, "I will stay by my rights."

While the testimony of Alt showed some hostility toward the defendant and was impeached to some extent, its credibility was for the jury, and we cannot say that the impeachment was of a nature serious enough to prevent the jury from believing a substantial part of his testimony, which appeared to be corroborated by other competent testimony.

For a day or two following the tragic occurrences of February 11, defendant declined to disclose any information concerning the happenings at his home on that day. He did, however, have some discussion with O. C. Lee, an investigator for the bureau of criminal apprehension, at the hospital on February 14. We quote from the testimony of officer Lee:

Q. "Go ahead and tell the jury just what was the conversation.

A. "I said: 'Paul, I will make an outline of the case to you, just as I see it.' Previous to that he had told me that they had an argument or quarrel around the noon hour. So I said, 'Paul, the way I think this happened, you folks had a quarrel in the living room and it ended up in the kitchen. One of you had this big shotgun, 12-gauge Winchester shotgun, and you were fighting to see who could get possession of it. And I think that you got possession of it at last, and you backed up to the southwest door, and the two women, your mother and your wife, and the boy, was down by the range, and I think you killed them all.' And then, I said, 'I think you tried to commit suicide afterwards and you failed.' And I said, 'Wasn't that about it?' He said, 'Something like that.' Now, that was all there was said that day."

A few days later he gave to the officers a signed statement, state's exhibit E, reading as follows:

"This statement is made by me in regard to the tragedy which occurred at my farm in the Township of Enterprise, Jackson County, Minnesota, on the 11th day of February, 1936.

"Just before noon on said day my wife, Mary, and myself had been quarreling. I left the house and went to the barn and was

gone approximately ten or fifteen minutes. On my way back to the house I heard a noise coming from the house which sounded to me like a gunshot. This was when I was approximately 75 feet from the house. I entered the house by the east door and upon opening the door saw my mother, Marie Poelaert, lying on the floor of the kitchen with part of her head shot away. She was lying with her head in a southerly direction. My wife, Mary, was in a half crouching position with a Winchester Repeating 12-gauge shotgun in her hands with the barrel pointed toward me and the door. I grabbed up the gun and tried to push it away from me and as I did so the end of the gun came in contact with my forehead and the gun was discharged conflicting [inflicting] the wound that I now have.

"As I entered the door I noticed my oldest son in the kitchen. I was knocked down by shock of the injury I received and upon awakening I still had the shotgun in my hand. I then walked over to the southwest door and sat on the steps leading to the second floor of the house. I started for the barn to tell the hired man to get help as I figured that I would die at any time. Because of the cold weather I returned to the house and started up the stairs to get my sheepskin coat which was in an upstairs room. When about half way up the stairs, I felt faint and sat down on the stairs for a few moments. I then came downstairs and took Theodore Alt's coat and went out to the barn to find said Alt to send him to the neighbors for help. I took the shotgun with me to the barn and upon reaching the barn placed it in a manger near the door. I called to Alt for help and when he came into the barn told him to go and get help.

"While Alt was gone I went up the ladder in the barn to the hayloft and hid the shotgun, covering the same with hay and staying in the barn until the neighbors came and took me away.

"At the time of the tragedy I had in the house several boxes of Klean Bors and Airo Express 12-Gauge shotgun shells, such as were found in the repeating shotgun which gun and shells are now in the possession of the sheriff of Jackson county.

"I never saw my wife, Mary, nor my oldest son after I regained consciousness after being shot as I have hereinbefore described. It is my opinion that during the time I was dazed they went into the living room of the house. I did not know that the house was on fire and that it burned down until the day following the tragedy.

"Since my wife's mother's death about a year ago, she has been acting queerly and her mind seemed to have been affected. At certain times she was hysterical and violent and at one time without excuse struck me on the head with a very heavy iron poker. My wife on several occasions had threatened to 'clean up' all of the family and said she had something to take care of herself with. I know that there was a small bottle of carbolic acid in one of the upstairs rooms.

"I make this statement on this 27th day of February, 1936, in regard to the tragedy, freely and voluntarily and without promise on the part of anyone of any immunity or leniency whatsoever and same has been read to me by O. C. Lee and I understand same fully.

"I have signed this in the presence of O. C. Lee and H. V. Himsl.

"PAUL POELAERT."

At the trial defendant testified to substantially the facts set forth in the statement except that in his testimony he did not expressly refer to hiding the gun. He went to considerable length in relating the difficulties that existed between him and his wife. According to his version their difficulties were aggravated to some extent by reason of his mother's presence in the home. Defendant's testimony concerning the difficulties between the mother and daughter-in-law was controverted by other witnesses who testified in behalf of the state that the relations between defendant's wife and his mother were cordial.

Defendant's gun was found in the haymow a few days after the tragedy. He admitted on the witness stand that he took the gun from the house to the barn after the shooting and during the absence of Alt took the gun up into the haymow and laid it beside him.

We have not attempted to set forth all of the facts appearing in the record. To do so would unduly lengthen this opinion. We

have related the ones, however, which present a fair picture of the horrible tragedy which occurred on the day in question.

The case was well tried. Defendant was represented by able counsel, who developed to the utmost every point within the confines of proper practice that might operate in his favor in a case possessing so many circumstances damaging to him. A conviction resulted, and we are asked to set aside the verdict and grant to the defendant a new trial. For the reasons hereinafter stated, we feel that this should not be done.

■ Defendant's counsel, with commendable zeal, urge that the verdict of conviction is not justified by the evidence. While conceding that the fact of death was satisfactorily proved, defendant contends that the fact of the killing by him was not proved beyond a reasonable doubt. A careful examination of the evidence satisfies us that there was ample proof from which the jury could find the defendant guilty beyond a reasonable doubt of the crime charged against him. His previous treatment of his wife; his threats to kill her, if found to be true by the jury, and they apparently were; his conduct on the day of her death and thereafter; the burning of the house, with no apparent effort on the part of the defendant to extinguish the fire; the carrying of the gun from the house to the barn and its concealment; his statement to officer Lee that this affair happened as related by Lee; his signed statement, and even his own testimony, all had an important bearing upon the question of defendant's guilt or innocence. True, the jury might have accepted defendant's explanation of what happened, but it declined to do so, and unless we find in the record some error that deprived defendant of his legal rights the verdict must stand. The fact that there might have been some inconsistency in the testimony of some of the state's witnesses or even the fact that two or more witnesses for the state differ in their testimony does not preclude a conviction. 2 Dunnell, Minn. Dig. (2 ed.) § 2455a; State v. O'Connor, 154 Minn. 45, 191 N. W. 50. Nor can we say that the verdict resulted from passion or prejudice. It is no doubt true that some feeling exists in a community after the happening of events such as those involved here. The printed record does not indicate an

application for a change of venue because of prejudice, nor does it appear that there was any difficulty in the selection of a jury. The trial court presided with the utmost fairness, and we do not find anything in the record or in the assignments that would indicate otherwise.

■ Prior to the examination of the prospective jurors defendant made an application to the court (1) to require the state to provide the defendant with a list of names of the witnesses the state intended to call at the trial, and (2) to require the state to disclose its theory as to the manner employed by defendant in causing his wife's death. The requests were denied by the trial court. The statute requires that the names of the witnesses examined before the grand jury shall in all cases be inserted at the foot of the indictment or indorsed thereon. 2 Mason Minn. St. 1927, § 10637. No claim is made that this requirement was not complied with, but the defendant insists that it was the duty of the state, upon request, to furnish him with a list of its witnesses preparatory to the selection of the jury. No cases are cited in support of that position, and we are not familiar with any decision requiring that procedure. Possibly in the selection of a jury it might be important in some cases to know whether some designated person was to be a witness in the case, but even in that situation the question as to whether the information should be divulged should be left to the discretion of the trial court. Requiring a party to a suit, whether it be civil or criminal, to furnish his adversary with a blanket disclosure of all of his witnesses would be improper and often lead to abuse.

Defendant further contends that because of the provisions of U. S. Const. Amend. VI, he was entitled to a bill of particulars informing him of the exact nature of the offense with which he was charged or, in other words, the manner in which it was claimed by the state he brought about the death of his wife. The rule is that where the offense is of a general nature and the charge is in general terms the prosecution may be required to file a specification of the particular acts relied on to sustain the charge. 3 Dunnell, Minn. Dig. (2 ed.) § 4401; State v. Holmes, 65 Minn. 230, 68 N. W. 11; State v. Brooks, 151 Minn. 502, 187 N. W. 607; State v. Wassing,

38

141 Minn. 106, 169 N. W. 485. If an indictment is so general that it fails to give defendant adequate notice of the charge, the court should require a bill of particulars. The propriety of such a requirement depends upon the facts of the particular case. The matter rests largely in the discretion of the trial court. 3 Dunnell, Minn. Dig. (2 ed.) § 4401. In the case of State v. Wassing, 141 Minn. 111, the court said:

"If an indictment is so general that it fails to give the defendant adequate notice of the charge he is expected to meet, the trial court should require a bill of particulars. 3 Wharton, Crim. Pro. (10th ed.) § 1637. The propriety of such requirement depends upon the facts and circumstances of the case. 2 Bishop, Crim. Pro. § 643; State v. Davis, 39 R. I. 276, 97 Atl. 818, Ann. Cas. 1918C, 563; State v. Carter, 188 Ill. App. 22. The matter rests largely in the discretion of the trial court. Had the court required the state to give the defendant the particulars demanded in this case and to confine its proof thereto, it is plain that this would have been much more exacting than a requirement to make an election. It was not error to deny this motion."

Here the indictment was not so general as to require the furnishing of a bill of particulars. In fact it was quite specific and charged that the defendant on the "11th day of February, A. D. 1936, at the Town of Enterprise in the County of Jackson and State of Minnesota did wilfully, unlawfully, wrongfully and feloniously without the authority of law and without excuse or justification, and with a premeditated design to effect the death of a human being, to-wit: one Mary Poelaert, assault, kill, and murder said Mary Poelaert, in some way and manner and by some means, instruments, and weapons to the Grand Jury unknown, by reason of which way, manner and means, instruments, and weapons the said Mary Poelaert did then and there die." We do not see how the state could have been much more specific in its charge than as set forth in the indictment. The instrument specifically stated that the killing was done in a way and manner and by means, instruments, and weapons unknown to the grand jury. It is not always

possible to prove the exact manner of death. Failure of specific proof of the exact manner of death should not, however, prevent conviction where adequate proof that the death was caused by the act of the accused in some manner is available. We therefore hold that it was not error for the court to deny defendant's motion to require the state to elect as to its theory of the manner in which death was caused.

■ The defense presents this further question. While in the hospital a few days after his arrest defendant was visited by a deputy fire marshal. The sheriff of Jackson county and a representative of the bureau of criminal apprehension were present at the conference. Defendant was asked numerous questions and answered the questions propounded. Notes were taken by the deputy fire marshal in his own handwriting. Later he went to the office of the county attorney, where he dictated from the notes to a stenographer and a typewritten statement was prepared. This statement, state's exhibit E, was later presented to defendant for his signature. He signed the same. At the trial the statement was offered in evidence by the state and was received as an exhibit without objection.

The deputy fire marshal appeared as a witness for the state. He was permitted to testify as to the conversation with the defendant in the hospital prior to the signing of the statement. This testimony also went into the record without objection. Upon cross-examination and as a part thereof, the defense endeavored to require the deputy fire marshal to produce the original notes taken in the hospital in an effort to show that the statement as prepared and presented to defendant for his signature embodied a statement to the effect that defendant hid the gun, while the notes taken by the deputy fire marshal did not contain such statement. The state objected to the production of the notes, claiming that the evidence was privileged, and the objection was sustained. The failure to permit the defendant to require the deputy fire marshal to produce his original notes is claimed as error.

We do not see how the defendant's rights could have been prejudiced by the failure to require the deputy fire marshal to produce

his original notes. While the objection to the testimony was based upon the grounds of privilege, under the statute we do not think that question was in reality involved. 2 Mason Minn. St. 1927, § 5976. While the deputy fire marshal participated in the taking of the statement, the record shows that it was not taken pursuant to the provisions of the statute. The witness was not under subpoena by the fire marshal as provided by the statute. Nor does it appear that the statements were made under oath. Id. §§ 5956-5957. Regardless of the right of the defendant to have the notes produced and regardless of the right of privilege claimed by the deputy fire marshal, the record in this case shows that the statement was voluntarily signed by defendant and contains the following provision: "I make this statement on this 27th day of February, 1936, in regard to the tragedy, freely and voluntarily and without promise on the part of anyone of any immunity or leniency whatsoever and same has been read to me by O. C. Lee and I understand same fully."

Upon examination by his counsel and in answer to an inquiry as to whether he told the officers that he hid the gun, when telling his story to them, defendant's answer was: "I cannot recollect that I did." He was asked the following question:

"Now, with reference to this statement, called state's exhibit E, did you at any time tell anybody, either Mr. Himsl or Mr. Lee or Mr. Musegades, that you put hay over the gun?"

His reply thereto was: "No, I don't think I did—I cannot remember that I did." About the only discrepancy between defendant's testimony and the statement was that the statement contained the following:

"I took the shotgun with me to the barn and upon reaching the barn placed it in a manger near the door. I called to Alt for help and when he came into the barn told him to go and get help. While Alt was gone I went up the ladder in the barn to the hayloft and hid the shotgun covering the same with hay and staying in the barn until the neighbors came and took me away."

He testified as follows:

"I managed to get up the ladder, and picked up the gun again and walked to the southeast from the opening, from the ladder. And then I sat down in the hay there. I was going to lie down— it seemed like I felt worse when I was lying down. I don't know just how long I laid there, or how long I sat there. As far as I know, the gun was laying down alongside of me."

The jury had the benefit of defendant's version as to what happened in the barn and as to what he did with the gun. Giving to defendant's testimony the most favorable inferences, the facts that he took the gun from the house, took it to the barn, put it out of sight of Alt during the first conversation with him, afterward took it to the haymow in his wounded condition, all constituted damaging evidence against him. And even though the notes were actually produced in court and were shown to contain statements bearing out defendant's version of the affair on the witness stand, we do not see how they would have been very helpful to him or how defendant was prejudiced in this case by the failure to require the production of the original notes. Without holding that upon the showing made the notes were not competent as bearing upon the credibility of the testimony of the deputy fire marshal, we nevertheless hold that the error to receive same, if any there was, did not prejudice defendant's rights.

■ We have examined the numerous other assignments of error and find none that require special consideration. At any rate, none of the errors claimed are of such a serious nature that they require setting aside the verdict and granting a new trial.

Affirmed.

MR. JUSTICE PETERSON, having been attorney general, when the appeal in this case was taken, took no part in its consideration or decision.