## STATE v. LYNNARD HILL.

253 N. W. 2d 378.

April 8, 1977—Nos. 46238, 46623.

*Thomson, Wylde, Nordby, Blethen & Peterson, Bailey W. Blethen,* and *Mark W. Peterson,* for appellant.

*Warren Spannaus,* Attorney General, *William B. Randall,* County Attorney, and *Steven C. DeCoster,* Assistant County Attorney, for respondent.

PER CURIAM.

Defendant, Lynnard Hill, was found guilty by a jury of kidnapping, aggravated rape, aggravated sodomy, and indecent liberties. Defendant's appeal is based principally on a claim of mistaken identification and a post-trial recantation by the complainant. Because we believe the evidence supports the jury's verdict and the trial court's refusal to grant a new trial based upon the recantation, we affirm.

On February 11, 1975, 17-year-old Susan Cummings was living with her parents at 2004 Summit Avenue in St. Paul, but spent the evening with a former boyfriend, Jerry Wilcox, at his apartment at 1139 University Avenue. Susan, Wilcox, and two of Wilcox' friends watched television and talked. After Wilcox' friends had left, Susan realized that she had missed the last bus on University Avenue and that neither she nor Wilcox had money for a cab.

At about 1 a. m. on February 12, Susan telephoned a friend, Maureen Johnson, who lived several blocks north of University Avenue on Rice Street. Susan asked if she could stay overnight at the apartment Maureen shared with two other girls rather than having to walk the longer distance to her own house on Summit Avenue. Susan suggested that Maureen and her roommate, Diane O'Connor, walk west on University to Dale while Susan walked in an easterly direction on University from Lexington so that they might meet at a midpoint. After talking with Maureen, Susan called her parents to inform them of her plans.

Susan decided to delay her departure for a little while to allow her friends to get dressed. However, Maureen and Diane left immediately. They walked south on Rice Street to University Avenue and turned west on University toward Dale Street, walking on the north side of the street.

A small blue Toyota with a horizontal gold or silver stripe stopped in front of them at a cross street and the male driver asked for directions. Maureen and Diane ignored his request and he drove away. A few minutes later, however, the same car stopped again and the girls observed that it had a dim left headlight and a "red thing" in the back window similar to a flickering light, which gave off a yellow or orange glow.

The driver, a young black male with a black leather coat and a gold nightcap on his head, leaned toward the window and asked Maureen and Diane if they needed a ride, but when they responded that they were meeting their boyfriends, he drove away.

The two girls were so frightened by this encounter that when they reached Kent and University and did not see Susan one block west at Dale Street, they turned around and walked back to their apartment on Rice Street, seeing neither the blue Toyota nor the driver again that night.

Meanwhile, Susan Cummings, having delayed her departure, began to walk in an easterly direction on the north side of University Avenue at about 1:40 a. m. As she reached a location two

blocks east of Lexington, a small blue Toyota with a gold horizontal stripe on the side pulled up beside her and the driver asked her for directions. Susan pretended that she did not hear him and kept on walking. She began to run when she saw the car turn north at the corner but encountered the Toyota once more as it came around the block.

The car stopped on a side street just in front of Susan at Kent and University. The driver got out, approached her, asked where she was going, and offered her a ride. Susan observed that he was a young black man, about 6 feet 5 inches tall, wearing dark clothes, a yellow nightcap and an earring. She thought he had "something silver" resembling an automatic pistol in his hand.

The man walked toward Susan, grabbed her by the arm and around the neck, and dragged her into the open driver's side of his two-door car. Although Susan screamed, kicked, and even struck the horn in her struggle to escape, apparently no one heard or saw her. Her assailant threatened to "put [her] out" if she did not cooperate.

The assailant drove about a block away to a parking lot in an alley between Sherburne and University. There, he removed Susan's clothes and his own, and performed various sexual acts upon the victim without her consent, including, as found by the jury, the crimes of aggravated sodomy, aggravated rape, and indecent liberties. The victim testified that she did not resist further because of her fear of injury and because her assailant promised to set her free if she did what he wanted.

Susan observed certain unique features of her assailant's automobile during the period of time she was confined there. She noticed that there were brown and white or black and white checked bucket seats, and that there was a tape deck on the floor beneath the front of the driver's seat.

After Susan and her assailant dressed, he released her at Mackubin Street between Sherburne and University, about one block from the scene of the assault, as he had promised. As the car drove away, Susan observed something red in the rear window of the vehicle.

Susan ran into University Avenue and asked the driver of a city snowplow for help and for a ride to Maureen Johnson's apartment on Rice Street. She arrived there at about 3 a. m., upset and frightened, and told Maureen and Diane of her experience. It was then that Maureen and Diane became aware that they had encountered the same person in the blue Toyota while they had been walking west on University to meet Susan only a short time before she was assaulted.

Susan was too frightened to call the police immediately, as her friends urged her to do, but that afternoon she reported the criminal attack. The police arrived to question Susan and then drove her to St. Paul Ramsey Hospital.

A physical examination of the victim revealed evidence consistent with forceful intercourse, and microscopic examination disclosed the presence of a limited number of non-motile sperm. Scientific analysis of the victim's blue jeans and underpants, worn the night before, showed similar evidence.

The St. Paul police department received specific descriptions of the assailant and of his automobile from the victim and her two friends. The police checked with the only St. Paul Toyota dealer, and the investigation revealed that an automobile similar to the one described had recently been sold to one Lynnard Hill, who lived in the vicinity of the crime. On February 18, 1975, after police had observed the Toyota parked in front of Hill's residence at 880 Thomas, the victim and Diane O'Connor were driven to the location to see if they would recognize the car. The girls made a positive identification of the Toyota parked in front of Hill's house and walked by it to affirm their belief.

Subsequently, on February 19, 1975, the three girls were shown a series of nine photographs, including one of Hill. Diane O'Connor chose Hill's photograph as the one most resembling the man in the blue Toyota who had spoken to her on the night of February 12. The other girls were uncertain of their identification of defendant based upon the photographs.

On February 22, an order was issued to arrest Hill and to impound his automobile. Hill, after being taken into custody, volun-

tarily gave his consent to the police to search and photograph the vehicle, acknowledging that the car was his and that no one else had driven it. He consistently denied any connection with the crime.

Hill was placed in a four-man lineup on February 24, 1975, and was positively identified by Susan, the victim, as the man who had raped her. Maureen Johnson also identified Hill as the man who had spoken to her from the blue Toyota on the night in question, and Diane O'Connor identified Hill, although not positively. After the lineup, the three girls were taken to the public safety building to view the impounded car where they positively identified it. At trial, Susan Cummings made an in-courtroom identification of Hill as the man who had attacked her, and Maureen Johnson testified that Hill was the one who had spoken to her from the blue Toyota. Diane O'Connor testified that she thought the defendant was the man she had seen that night but couldn't be certain.

Hill continued to maintain his innocence and members of his family testified that he had been at home after 9 p. m. on the night in question and had been in bed asleep at the time the attack occurred. Hill's two brothers, a sister, parents, and two friends stated that he did not own a gun, a black leather coat, or a yellow cap and had never worn an earring. Hill also testified to all of the above on his own behalf.

The jury nevertheless found Hill guilty of all four charges, and this appeal followed.

1.   The first question for decision is whether there was sufficient evidence to identify defendant as the assailant. Defendant's theory of defense was not predicated on any contention that the victim had not been assaulted or that she had consented to the crimes charged, but only that he had been mistakenly identified as her attacker. He steadfastly maintained that he was not the perpetrator of the acts and had been at home asleep at the time of the offenses.

The victim gave a clear and convincing description of her assailant's person as well as detailed and specific observations of

his unique and distinctive blue Toyota with its racing stripe, tape deck beneath the driver's seat, checked bucket seats, and candle on the rear window ledge. The victim, held prisoner in her assailant's car for the entire period of the assault, had ample time to make observations and to form a mental image sufficient to support her subsequent identification of the assailant and his car. Moreover, her identification was buttressed by that of her two friends, one positively as to defendant's face observed through the open car window, and both positively as to the unusually marked automobile. All three witnesses placed the vehicle and its driver in the area of the crime within a few minutes of its commission.

In weighing this testimony, the jury could well have considered the fact that none of the three witnesses had any motive to fabricate and, in addition, the fact that none of the witnesses had any prior association with defendant. The two similar and substantially contemporaneous encounters by the assailant with the victim and with her friends could have led the jury to conclude that both incidents involved the same person. The identification was further substantiated by the witnesses' similar observations as to the appearance of the driver and as to the make, color, and specific details of the car. Further, it was the initial description of this vehicle by all three young women which led directly to the Toyota dealer and hence to the arrest and subsequent eyewitness identification of defendant.

Defendant argues that certain variations between the witnesses' identification testimony as to the exact color of the checked seats or the stripe on the side of the car establish doubt as to the identity of the assailant. However, the fact that there might be some inconsistencies in the testimony of the state's witnesses does not preclude a conviction. State v. Senske, 291 Minn. 228, 190 N. W. 2d 658 (1971) ; State v. Poelaert, 200 Minn. 30, 273 N. W. 641 (1937).

Identification testimony need not be positive and certain. It is sufficient for a witness to testify that it is her opinion, belief,

impression, or judgment that the defendant is the person she saw commit the crime. The factors which affect the reliability of the testimony, such as time to observe and circumstances under which the observation was made, go to the weight to be accorded to such testimony by the jury and not to its admissibility. State v. Senske, *supra*; State v. Burch, 284 Minn. 300, 170 N. W. 2d 543 (1969); State v. Ellingson, 283 Minn. 208, 167 N. W. 2d 55 (1969).

On appeal, this court is required to view the evidence most favorable to the prosecution if it reasonably sustains the verdict and must assume that the jury believed the state's witnesses and disbelieved the defendant's contradictory testimony. State v. Villalon, 305 Minn. 547, 234 N. W. 2d 189 (1975); State v. Dienger, 286 Minn. 436, 176 N. W. 2d 528 (1970). In considering the sufficiency of the evidence, this court does not try the facts anew but must painstakingly review the record to determine whether the evidence, both direct and circumstantial, viewed most favorably to support a finding of guilt, is sufficient to have allowed a jury to reach that conclusion. State v. Ellingson, *supra*; State v. Daml, 282 Minn. 521, 162 N. W. 2d 240 (1968).

We have concluded that the state's evidence offered by the victim, in conjunction with and corroborated by the testimony of her two friends, is sufficient to sustain the verdict of defendant's guilt beyond a reasonable doubt and amply supports his conviction of the crimes charged.

2. We must next decide whether the trial court improperly refused to grant a new trial after the complainant partially retracted her positive courtroom identification of the defendant.

On November 13, 1975, after his conviction, defendant moved the trial court to vacate the conviction and to order a new trial on the ground of newly discovered evidence. He contended that the victim, Susan Cummings, had retracted her positive courtroom identification of defendant as her assailant. An evidentiary hearing was held on December 5, 1975, at which Susan Cummings testified concerning her alleged recantation. Defendant

argues that the trial court abused its discretion by failing to grant a new trial in light of the victim's purported repudiation of her former testimony.

The trial court's order denying a new trial included clear and comprehensive findings that the victim's testimony at trial had not changed materially and that she had been subjected to a pattern of pressure and harassment after the trial. The order explained in part:

"* * * In the instant situation the complaining witness, Susan Lea Cummings, has not recanted her testimony, rather she expressed her lack of assuredness with one facet of her identification, that relating to the face of defendant which she states she no longer is sure of. She says however that 'the size, shape and everything else about him seemed to fit.'

"In addition, at the hearing she acknowledged that at the line-up prior to trial she was positive of her identification, and at the trial when she identified defendant she was equally positive. * * * Of great significance was Miss Cummings' description of a series of pre and post trial contacts which, she said, brought her to the point, 'I just want to forget this whole thing and get it over with.' * * *

"* * * Most particularly she related that an investigator named John followed and questioned her, and questioned many of her friends. * * *

"* * * [T]he same man, to the best of Miss Cummings' knowledge, went to her work and school to inquire about her. She said that other of her friends advised her that the same man approached them regarding her, and that the inquiry continued from the time of trial virtually to the date of the December hearing. * * *

"* * * Another friend wrote to Miss Cummings about the investigator talking to the writer regarding the witness' character as well as the actual facts of the case. * * *

"A girlfriend of the defendant's cousin spoke often with Miss Cummings. [She] threatened her and said 'that 20 years was a

long time out of somebody's life and how would I like 20 years taken out of my life and stuff like that.' * * *

"Apparently, [she] was instrumental in bringing the witness to defendant's attorney to make an unsworn statement in advance of the December hearing. 'She was down there, and she kept calling me and asking me to come down there . . . she said that I was crazy and that somebody's going to try to prove it or something like that . . .' * * *

"* * * Friends have called her about the distributed literature printed on the defendant's behalf * * *. One piece in particular implied that the whole claim by Miss Cummings was that of a white woman bent on a racial attack on the defendant. * * *

"Up to the time of the hearing in December Miss Cummings received telephone calls, day and night, wherein unidentified people would 'read things to me about the case that they found out, or they would tell me something about the case that they heard . . .' * * *

"Also, a few telephone calls came to her at night, awakening her, with people screaming at her or making threatening sounds towards her. * * *"

Based on these facts, the trial court concluded:

"This Court is not reasonably convinced that the witness has recanted or that a jury would reach a verdict different than that rendered in May of 1975. Accordingly, defendant's motion for a new trial is denied."

In Whelan v. State, 298 Minn. 545, 214 N. W. 2d 344 (1974), we set forth a two-pronged test for the determination of whether a new trial should be granted when a victim purportedly recants trial testimony:

"The rule in cases of this sort is that the trial court should grant the defendant a new trial if (a) the defendant has acted with due diligence in seeking a new trial and (b) the court is reasonably convinced that the witness has indeed recanted and that without this witness' perjured testimony at trial the jury might

well have reached a different verdict. See, Minn. St. 547.01(4);
State v. Klotter, 274 Minn. 58, 142 N. W. 2d 568 (1966); State
v. Wheat, 166 Minn. 300, 207 N. W. 623 (1926). See, also, Larrison v. United States, 24 F. 2d 82 (7 Cir. 1928); 24 C. J. S.,
Criminal Law, § 1454(k)."

Courts have traditionally looked with disfavor on motions for
a new trial founded on alleged recantations unless there are extraordinary and unusual circumstances. See, State v. Arradondo,
260 Minn. 512, 110 N. W. 2d 469 (1961); Annotation, 158 A. L.
R. 1062. This rule is particularly relevant where possible changes
in testimony have been occasioned by threats, pressure, and intimidation. State v. Mastrian, 285 Minn. 51, 171 N. W. 2d 695
(1969); State v. Thompson, 273 Minn. 1, 139 N. W. 2d 490 (1966).
Where the "newly discovered" evidence is of doubtful character
and the particular circumstances of a case do not lend credence
to the appellant's claim, we will not hold that the trial court
abused its discretion in denying a motion for a new trial. State
v. Wofford, 262 Minn. 112, 114 N. W. 2d 267 (1962).

We hold, under all of the circumstances, that the trial court
did not abuse its discretion in its denial of defendant's motion
for a new trial.

3.   Defendant claims that certain statements by the prosecutor in his final argument were improper and prejudicial, and require a new trial. Included in the state's final argument were the
following remarks:

"* * * [R]easonable doubt is a subjective standard. * * *
[W]hile it is the duty of you to give the defendant the benefit
of every reasonable doubt, *don't search for doubt search for the
truth.* * * * *Don't use the proof beyond the reasonable doubt
requirement to avoid the performance of a disagreeable duty.*
* * *

                          *     *     *     *     *

"*Now, the defendant is presumed to be innocent just as every
defendant in every criminal case is, but the presumption of innocence is the presumption for the innocent, it's not a cloak that*

*the guilty can hide behind,* and when the State has proven its case, if you find that to be the case when you get to the jury room, you'll find that cloak falls and disappears. *It's not something the guilty can hide behind.* \* \* \*

"\* \* \* [M]*y duty is not to convict but to see or attempt to see justice done; while Mr. Peterson on his client's behalf has no interest whatsoever in having a guilty verdict returned at all."* (Emphasis supplied.)

Defendant submits that these remarks invited the jury to ignore the essential principle of proof beyond a reasonable doubt and misrepresented his constitutional protection of the presumption of innocence. Moreover, defendant argues that these comments belittled the role of his defense attorney while attempting to enhance the role of the prosecutor in the eyes of the jurors.

We have addressed the issue of prosecutorial misconduct in two recent cases, State v. Thomas, 307 Minn. 229, 239 N. W. 2d 455 (1976), and State v. Jensen, 308 Minn. 377, 242 N. W. 2d 109 (1976). In Thomas the prosecutor had stated, among other things, that "[constitutional safeguards] are meant to protect the innocent, not to shield the guilty." 307 Minn. 230, 239 N. W. 2d 456. While we affirmed the conviction, we stated in regard to this sort of argument:

"\* \* \* [T]he prosecutor argued that the presumption of innocence and the requirement of proof beyond a reasonable doubt are meant to protect the innocent not to shield the guilty, a proposition which we disapproved 43 years ago in State v. Bauer, 189 Minn. 280, 284, 249 N. W. 40, 42 (1933), \* \* \*.

\* \* \* \* \*

"Our admonition in the Bauer case having gone unheeded by prosecutors, *we now hold that henceforth it will be grounds for reversal for the court to charge or the prosecutor to argue that a defendant's constitutional rights 'are meant to protect the innocent but not to shield the guilty.'* " (Emphasis supplied.) 307 Minn. 231, 239 N. W. 2d 457.

The prosecutor's comments in this case that the presumption of innocence was a shield for the innocent and not a cloak to hide

the guilty were very similar to those in State v. Thomas. We again express our belief that remarks of this kind are improper and inappropriate. However, the instant case was tried prior to the issuance of our opinion in the Thomas case, and no objection was made to the argument at trial. Further, there is ample evidence to support the jury's verdict.

While we continue to disapprove of this form of argument, and intend to implement our holding in Thomas, we have concluded that the prosecutorial misconduct did not play a substantial part in influencing the jury to convict and, indeed, was harmless beyond a reasonable doubt. State v. Caron, 300 Minn. 123, 218 N. W. 2d 197 (1974). Therefore, it would be inappropriate to reverse the jury's verdict in this case based upon the final argument of the prosecutor.

4. The defendant contends that the trial court should have admitted testimony based upon results of a polygraph examination administered to him. In State v. Goblirsch, 309 Minn. 401, 407, 246 N. W. 2d 12, 15 (1976), a case in which we were urged to reverse because of failure to admit evidence of a polygraph test, we observed:

"* * * Defendant urges that this court now reconsider the rule of inadmissibility set down in these earlier cases. We decline to do so in this case because of the prosecution's nonparticipation, and because we are not persuaded that the reliability of polygraph evidence has improved sufficiently in recent years to warrant reversing these prior decisions or questioning their rationale."

Here, as in Goblirsch, there was no stipulation by or participation of the prosecution, nor even a prior offer to take such a test to be administered by the state. Therefore, defendant's request for the admission of this evidence was properly denied.

Defendant also argues that the trial court erred in refusing to grant a mistrial based upon alleged jury misconduct. We have carefully considered this claim and find it to be totally without merit.

Affirmed.