## STATE v. KENNETH KLOTTER.

142 N. W. (2d) 568.

April 29, 1966—Nos. 39,738, 39,926.

---

*David C. Priebe,* for appellant.

*Robert W. Mattson,* Attorney General, *George M. Scott,* County Attorney, and *Theodore R. Rix,* Assistant County Attorney, for respondent.

FRANK T. GALLAGHER, C.

Consolidated appeals from the judgment of conviction and the order of the district court denying defendant's motion for a new trial.

On October 13, 1963, a sporting goods store in Minnetonka Village owned by Robert Barrett was burglarized of five guns, ten bows, some arrows, ammunition, and petty cash. The store had been entered forcibly and the front door was smashed. Also on that date the home of John Evans was burglarized, and seven guns, some ammunition, and several fishing rods were taken.

The charge against defendant as set out in the information was for burglary of the Barrett store, for which defendant was convicted by a jury. He was sentenced to the commissioner of corrections at St. Cloud for a term not to exceed 3 years.

The conviction was based on circumstantial evidence, no one having seen defendant at the Barrett store on the date in question. The only evidence supporting the conviction was defendant's possession of one of the guns stolen from the Barrett store and four of those stolen from the Evans premises.

Viewing the evidence most favorably for the verdict, it appears the defendant entered a tavern in North Minneapolis, tended by witness Gary

MacKenzie, at some time in the forenoon on October 15 and offered to sell five guns to MacKenzie, who was also in the business of buying and selling guns. Defendant went to his car and brought in the guns, explaining that they were being sold for a friend. MacKenzie asked the defendant whether they were stolen and said, "They can't be hot, because I have to register them with the police department." He was told they were not. After examining the guns, MacKenzie paid defendant $135 in cash for them and testified at trial that this was a fair price. During the entire transaction, according to MacKenzie, defendant was alone with him, and prior to that morning he had neither received a call from defendant or anyone else nor had he seen anyone concerning the five guns. There was evidence that one of the guns sold to MacKenzie was taken from the Barrett store, the other four from the Evans home.

Over defendant's objection, evidence of the Evans burglary was admitted at trial. The Evans and Klotter families were friends of some 10 years. Defendant had visited the Evans home on numerous occasions, often to give Susan Evans, the 14-year-old daughter, transportation to the movies or to ice cream parlors. Defendant was familiar with the Evans home, knew Mr. Evans owned some guns, and had seen the gun rack on previous occasions in Mr. Evans' bedroom, which was on the main floor. Late in the afternoon or early evening on October 13, defendant telephoned Susan. She testified, "He had asked if his sister was at our house, and I said no, and he asked where she was and I said I didn't know, and he asked if my parents were at home, and I said no. * * * And then he asked if I wanted to go out and get an ice cream cone * * *." She agreed to do so. Upon arriving at the Evans home around 7:30 or 8 p. m., according to Susan, defendant noticed John Crest, a hired man who lived with the Evans family and who had arrived sometime after the telephone call. He asked Crest if he wanted to visit defendant's brother at defendant's house and Crest said he did. Susan, Crest, and the defendant then left in the latter's car and returned to the Evans home about 9 p. m. that evening. Defendant did not enter the Evans home so far as Susan knew.

John Evans testified that he knew the guns were taken from his home between 2 p. m. October 13, when he had left the house, and 2 a. m.

October 14, when he returned, because pieces of the gun case had been torn loose and were lying on his bed when he returned and they had not been there when he left.

Defendant's testimony, substantially corroborated by his wife and a witness, Harry Swaggert, conflicts with the state's version. Defendant admitted that he was convicted of burglary in 1958 and served about 3 years 9 months in the reformatory. He denied any connection with either the crime charged or the Evans burglary and related the chronology of events on October 13 as follows: He was at his parents' home on the afternoon of October 13 when Susan Evans telephoned him and asked whether he could take her to a drugstore for ice cream and soft drinks, which he agreed to do. He drove to her home and picked her up along with John Crest, who desired to see defendant's brother, and the three of them left in defendant's car. Approximately 30 minutes later he returned them to the Evans home. Later that evening he went to Lavardo's Bar in Minneapolis with his wife and mother-in-law. Swaggert was also at the tavern. While in the bar he was approached by a "guy" who asked for assistance in selling some guns, and when he inquired who owned the guns, the "guy" explained that he and his father owned them. For a payment of $15, defendant agreed to sell the guns to MacKenzie. He claimed that contact with MacKenzie was made by Swaggert and that MacKenzie agreed to meet with defendant the next day. On that day, defendant took the guns to MacKenzie's place of work and MacKenzie purchased them for $135.

Although defendant said he knew the person who gave him the guns at Lavardo's, he refused to divulge his name at trial but gave no reason for his refusal. Subsequently, however, defendant's wife testified that the name of defendant's friend was Willie Alger. Then, she gave the following testimony:

"Q.   Is there any particular reason why that you did not come forward with this name of Willie Algers to help clear your husband before today?

"A.   I didn't want to get him in trouble. I didn't want to bring his name out.

\*    \*    \*    \*    \*

"Q. Did you ask your husband about whether he would give this man's name?

"A. Yes.

"Q. What did he tell you?

"A. Well, he told me not to. He told me not to give it. We talked it over and it will help him."

No attempt was made to obtain Alger as a witness prior to the jury's verdict, but subsequently he dictated three inconsistent statements. In an examination following trial, he denied any connection with or knowledge of the thefts. Later, in a statement dictated to the sheriff of Goodhue County, he admitted committing the crime charged but claimed defendant aided and abetted him in the commission thereof. Finally, on December 4, 1964, 6 months after defendant's conviction, Alger stated that he was solely responsible for both the Evans and Barrett burglaries and asserted that defendant was in no way connected with these crimes. At the time this statement was made, Alger was incarcerated in the St. Cloud Reformatory.

The defendant assigns as error on appeal the trial court's rulings (1) allowing evidence relating to the crime at the Evans home inasmuch as that crime was not charged against the defendant in the information; (2) denying defendant's motion for a directed verdict and acquittal on the ground that there was not sufficient evidence to justify a verdict of guilty; and (3) denying his motion for a new trial. In that connection defendant raises the legal question as to whether the statement of William Alger is newly discovered evidence of sufficient import to warrant a new trial.

■ With respect to defendant's first assignment of error, this court stated in State v. Elli, 267 Minn. 185, 125 N. W. (2d) 738, that as a rule evidence connecting defendant to other crimes is not admissible, principally because it has a tendency to justify, to the jury, a finding of guilt irrespective of the charge on which he is being tried. However, it is generally understood that there are exceptions to this rule.[1] Evidence of

---

[1] State v. Wofford, 262 Minn. 112, 114 N. W. (2d) 267; Note, 37 Minn.

a separate crime may be admitted if it has a reasonably close relation in scheme and pattern and in time to the act charged. The determination of whether independent criminal acts are so closely related to the crime charged as to be admissible is a matter resting largely within the discretion of the trial court, and this court will not reverse unless there is a clear abuse of discretion.[2]

It is our opinion that the two crimes were connected closely enough in time, place, and manner so that the admission of evidence of the Evans burglary was not an abuse of discretion on the part of the trial court. Both crimes involved burglary primarily of firearms—guns. The two crimes occurred on the same day or night. The two places burglarized were only 5 miles apart, close enough so that both crimes could have been committed on the same night, and the guns sold by defendant were identified as taken from the Barrett store and the Evans home. In addition, the testimony at least suggests that even if the defendant did not himself burglarize the Evans home, a jury could reasonably find that he aided and abetted the burglary by "scouting out" the Evans home to assist in making it possible for an accomplice to burglarize the house at a time when defendant must have known that all of the occupants were away.

■  We find no reversible error in the court's denial of defendant's motion for a directed verdict and acquittal. Although some of the evidence was circumstantial, an examination of the record in its entirety satisfies us that there was sufficient evidence to support the verdict of guilty. There can be no dispute that the premises were burglarized. It is not our duty to examine the evidence for any purpose except to determine that there was evidence from which the jury could reasonably conclude that the defendant participated in the crime. He had possession of some of the stolen property when he sold the guns to MacKenzie. The jury could, and apparently did, reject the truthfulness of his explanation as to how he obtained possession. The jury reasonably could have inferred from the refusal of the defendant to reveal the name of the person from

L. Rev. 608. See State v. Sweeney, 180 Minn. 450, 231 N. W. 225, 73 A. L. R. 380, for a list of exceptions to the rule.

[2] State v. Spreigl, 272 Minn. 488, 139 N. W. (2d) 167; State v. DePauw, 246 Minn. 91, 74 N. W. (2d) 297.

whom he received the guns and from the fact that he received money from the sale of the guns that he participated in the crime. Where the evidence is competent and sufficient to sustain a conviction beyond a reasonable doubt, it is for the jury to judge the credibility of the witnesses, to find the facts, and to draw inferences in the light of all the evidence, and its verdict must stand. State v. Waltz, 237 Minn. 409, 54 N. W. (2d) 791. We believe that rule applies under the record here.

■ It is our opinion that the trial court did not err in denying defendant's motion for a new trial. The motion appears to have been based principally on the contention that the affidavit of William Alger was newly discovered evidence. The state argues that Alger's affidavit was not newly discovered evidence.

Granting a new trial for newly discovered evidence is a matter of discretion with the trial court, and the inquiry of the supreme court is not whether a new trial might properly have been granted by the district court but whether refusal to grant a new trial involved a violation of a clear legal right or a plain abuse of discretion.[3] It must be shown that the evidence could not have been discovered before trial by due diligence and that the newly discovered evidence at the time of trial was not within the knowledge of the accused or is not merely cumulative. It must also be shown that, in the event of a new trial, the newly discovered evidence will probably produce a different or more favorable result.

(a) In the case at bar, there appears to have been no attempt by defendant to obtain Alger as a witness, even though his identity was known and apparently he could have been brought in as a witness in time by asking the court for a continuance. Thus, defendant fails in one requirement in that he could have secured the "newly discovered evidence" with due diligence.

(b) It is reasonable to assume that the evidence was within the knowledge of the defendant at the time of trial. He appears to have withheld the information for one reason or another, and it seems irregular, at least, to allow him at this late date to gain a new trial to present this same evidence he purposely concealed.

---

[3] State v. Wofford, *supra;* 14 Dunnell, Dig. (3 ed.) § 7125.

(c) Finally, while it is possible that Alger's testimony might produce a different result, there is enough doubt about it so that we can find no abuse of the trial court's discretion in denying defendant's motion. It would seem from the record before us that Alger has little respect for an oath or the truth. He made three statements, two under oath, and all three were different and inconsistent. These facts probably would be revealed at trial, by impeachment, and it is not unreasonable to suppose that the jury might disregard all of Alger's testimony.

Affirmed.