Edmund A. VIKSE, et al., Respondents,

v.

Gerald FLABY, et al., Defendants,

Joe S. Agers, et al., Appellants.

No. 51924.

Supreme Court of Minnesota.

Feb. 26, 1982.

Barnett, Ratelle, Hennessy, Vander Vort, Stasel & Herzog, Minneapolis, for appellants.

Healy & Bird Law Office, Charles A. Bird, Stewartville, for respondents.

SCOTT, Justice.

This is an appeal of a jury verdict and damage award for the respondents, taken from the district court in Fillmore County. The respondents, Edmund A. Vikse, Edna M. Vikse, and Sigurd A. Miland, plaintiffs below, commenced an action in 1978 against Gerald Flaby for securities violations and fraud. Flaby brought a third-party action against appellants Joe S. Agers and W. Shelley Richey.

The respondents' securities claims were dismissed because the statutory period of limitations had run. The respondents then moved to amend their complaint and add defendants Richey, Agers, Lowell F. Johnson and Thunderbird Valley, Inc., as direct defendants, and sought punitive damages against all defendants. This motion was granted in February 1979. On September 21, 1979, appellant Richey moved to dismiss the complaint against him on the ground of lack of personal jurisdiction. The trial judge denied the motion on October 25, 1979.

An affidavit of prejudice was filed in January 1980 against the first trial judge by defendants Richey and Agers, and the case was assigned to another judge and scheduled for trial in April 1980. The first trial ended when the defendants' motion for a mistrial was granted. The second trial began in the Fillmore County District Court on July 10, 1980. Prior to trial the plaintiffs settled with defendant Flaby. Thunderbird Valley and Johnson defaulted and did not appear at trial. It was subsequently learned that the plaintiffs had also settled with Thunderbird Valley.

The jury, by special verdict, awarded Miland $15,000 in general damages and $50,000 in punitive damages. The Vikses were awarded $3,000 and $50,000 for general and punitive damages, respectively. The damages flowed from the jury's finding that the defendants had defrauded the plaintiffs. Following the trial, the plaintiffs consented to a remittitur of $25,000 each on the punitive damage award. We affirm the decision of the trial court.

In November of 1972 Flaby went to the homes of Sigurd Miland and Edmund and Edna Vikse, the respondents, and persuaded them to loan money to an Arizona corporation, Thunderbird Valley, Inc. In exchange for the loans Miland and the Vikses received corporate promissory notes at 10% interest, with interest payable monthly and the principal due in five years. The loans were secured by mortgages on Arizona land owned by the corporation. The money was to be used by Thunderbird Valley, Inc., to develop the property which served as security for the corporate notes. Miland invested $15,000 and the Vikses invested $3,000 in Thunderbird Valley notes.

Flaby convinced the respondents to purchase the corporate notes by assuring them

that Thunderbird Valley was a safe investment; that the mortgages they received had a value in excess of the notes; and that Thunderbird Valley, Inc., was a good, reliable company. Flaby testified that he gave the respondents these assurances because he was led to believe by the appellants that they were accurate.

Agents of Thunderbird Valley had invited Flaby to view their Arizona office and property at the company's expense on two occasions. The company also had an office in Minnesota run by its shareholder Lowell Johnson. On those trips Flaby found what appeared to be a thriving corporation. During the trips he met appellants Richey and Agers, who, Flaby contends, both made statements about the financial soundness of Thunderbird Valley. Respondents attempted to show at trial that the glowing facade of Thunderbird Valley, as viewed by Flaby and as described by him to the respondents, concealed a fatally flawed financing structure that made the corporation's collapse inevitable.

Sigurd Miland and Edmund and Edna Vikse also signed a satisfaction-of-mortgage document at the time of their purchase of the corporate promissory notes. Flaby was directed by Thunderbird Valley to obtain signed mortgage satisfactions at the time of the sale. The avowed purpose of this practice was to make it easier to sell the property when the mortgage was paid off. Richey explained that he recommended the procedure and drafted the satisfactions in order to avoid the problems created when the mortgage holder could not be found or had died and, therefore, a satisfaction could not be obtained.

Flaby, as well as the respondents, was told that the satisfactions would be held in trust or escrow by a trustee apart from the corporation. In fact, the satisfactions were held by Thunderbird Valley, Inc., and were never put in trust. The plan of Agers and Richey was to use a company called First Foundation Corporation, which was solely owned by Richey, as the trustee. The vice of the failure to segregate the satisfactions from Thunderbird Valley was illustrated by the course of events. In November of 1973, after Agers and Richey had left the corporation, the satisfactions were filed in Arizona, thereby extinguishing the respondents' interest in their security.

The appellants contended that the satisfactions were filed pursuant to a trust agreement signed by the respondents. However, correspondence contained in the record demonstrates that the satisfactions were filed months before respondents' signed trust agreements were received. The respondents were elderly people, and unsophisticated investors.[1] Miland's testimony showed that he had no understanding of the significance of the mortgage satisfaction document.

The investment in Thunderbird Valley notes, which was so attractive to the respondents, was an investment in a corporation that was destined to fail. Thunderbird Valley, Inc., was a closely held corporation incorporated in Arizona in 1967. In November 1972 it had between 30 and 35 employees and four shareholders: Agers, Richey, John Holgate, and Johnson, each holding 25% of the shares. The real estate development company initially raised capital by selling land in a partially developed state for a small down payment and then selling assignments of the land sales contracts to individuals in other parts of the country.

From its inception, the company had a cash flow problem that both Agers and Richey recognized. This problem was accentuated by two developments. First, in May 1972 the Securities and Exchange Commission (SEC) sent Thunderbird Valley a warning letter advising the company of potential securities problems with the selling and assigning of purchase money mortgages on land contracts. In response to the letter, a shift to the issuance of corporate notes and mortgages on land owned by

---

1.  Edmund Vikse was 72 years old in 1972, and his wife Edna was 66. Sigurd Miland was 71 in 1972. Mrs. Vikse and Miland have eighth-grade educations, and Mr. Vikse did not complete the first grade.

Thunderbird Valley was made. Second, in October 1972, Thunderbird Valley received notice that the SEC would be filing suit in federal court in South Dakota to enjoin the interstate transfer of corporate promissory notes and mortgages. When the transactions were taking place with the respondents in November and December of 1972, the appellants were negotiating with the United States Attorney to voluntarily cease the distribution of corporate notes and mortgages.

Faced with the prospect of the loss of the major funding source for their company, Richey and Agers decided to abandon the sinking ship in December of 1972 and January of 1973, respectively. Following the loss of its major source of funding, its corporate president/general manager (Agers), and its corporate counsel (Richey), Thunderbird Valley, Inc., took a rapid turn for the worse.[2]

By the summer and fall of 1973 the respondents had begun complaining to Flaby, because their interest payments from Thunderbird Valley, which had been consistently late, were no longer coming.[3] In March or April of 1973 Flaby returned to Arizona and found Lowell Johnson in charge. Johnson had previously had an office in Minnesota, but Flaby had dealt directly with the Arizona office in the past. The corporation eventually ended up in bankruptcy, and Johnson was convicted in Arizona of crimes in connection with his handling of Thunderbird Valley. At the present time the respondents continue to pursue claims against the trustee in bankruptcy in Arizona.

This case presents the following legal issues:

(1) Whether the Minnesota long-arm statute and the United States Constitution permit Minnesota courts to exercise personal jurisdiction over a nonresident individual who was a stockholder, officer, director, and attorney for an Arizona corporation, where the corporation and the individual commit fraudulent acts in Arizona that cause damage in Minnesota.

(2) Whether the corporate officers of an Arizona corporation committed fraud against Minnesota individuals with whom the officers never directly dealt.

(3) Whether it was error to allow the jury to assess lump sum punitive damages for which the appellants would be held jointly and severally liable where the fraud occurred through the concerted effort of all appellants.

(4) Whether a new trial should have been granted upon the discovery that a purported accord—the signing of which was in dispute at trial—had in fact been signed.

(5) Whether appellants' claims of judicial error at trial are meritorious and, if so, whether the errors were prejudicial.

1. The trial judge based his finding of personal jurisdiction over appellant Richey[4] on the following facts:

(a) That, Defendant W. Shelley Richey at the time of the transactions referred to herein, and up to December 1, 1972, was a shareholder, officer, director and in house corporate counsel for Thunderbird Valley.

(b) Defendant Richey had personal knowledge that Gerald Flaby was marketing notes and mortgages for Thunderbird Valley, Inc., and that notes and mortgages were being marketed in the State of Minnesota.

(c) Defendant W. Shelley Richey on behalf of Thunderbird Valley, Inc. corresponded with various persons and attorneys in the State of Minnesota as indicated at plaintiffs' Exhibits 11, 12 and 13.

---

2. John Holgate, who had been in charge of land sales, resigned at the same time as Agers.

3. Miland received eight payments of $125.03 each, while the Vikses received five checks totaling $125. None of the respondents received any additional payments from Thunderbird Valley.

4. Appellants do not contest the assertion of personal jurisdiction over Agers on appeal. Presumably, he is an appellant in this action as to the other issues raised.

(d) Defendant W. Shelley Richey represented to Attorney Peter Neisser on or about November 20, 1972 that First Foundation Corporation would act as escrow agent for the holding of Satisfactions obtained from lenders such as the plaintiffs herein. First Foundation Corporation is solely owned by defendant W. Shelley Richey. Defendant W. Shelley Richey, as attorney for the corporation, approved the practice of taking Satisfactions from the plaintiffs and had personal knowledge that the same were kept by Thunderbird Valley, Inc. in the corporate offices and not in an escrow or trust account.

(e) W. Shelley Richey authorized, certified and approved the declaration of restrictions for Conquistador Estates # 1 as contained in Plaintiffs' Exhibit # 22, and particularly those provisions regulating sale and encumbrance of lots in less than the full, platted dimension. W. Shelley Richey, or some other person under his authority and control, determined which one-half lots would be encumbered by mortgages transferred to plaintiff Sigurd A. Miland.

(f) Defendant W. Shelley Richey had personal knowledge of the financial condition of Thunderbird Valley, Inc., and the pendency of the litigation commenced (Plaintiffs' Exhibit 18) at the times of the borrowings from the plaintiffs on November 20, 1972 and November 21, 1972.

(g) Defendant W. Shelley Richey through his affiliation with Thunderbird Valley, Inc. deliberately, and with wrongful purpose, set in motion and perpetuated a course of events, the inevitable effect of which was to harm Minnesotans in general and the plaintiffs in particular.

The Minnesota long-arm statute, Minn. Stat. § 543.19 (1980), was drafted in an effort to extend jurisdiction to the permissible limits allowed by constitutional due process. *See Toro Co. v. Ballas Liquidating Co.*, 572 F.2d 1267, 1269 (8th Cir. 1978); *Northern States Pump & Supply Co. v. Baumann*, 311 Minn. 368, 370–71, 249 N.W.2d 182, 184 (1976). The portion of the long-arm statute applicable to this case is subdivision 1(d):

Commits any act[5] outside Minnesota causing injury or property damage in Minnesota, subject to the following exceptions when no jurisdiction shall be found:

(1) Minnesota has no substantial interest in providing a forum; or

(2) the burden placed on the defendant by being brought under the state's jurisdiction would violate fairness and substantial justice; or

(3) the cause of action lies in defamation or privacy.

At trial the jury determined that Richey committed fraudulent acts and omissions outside Minnesota causing injury and damage in Minnesota. Therefore, the jurisdictional inquiry turns to the above-cited subdivision 1(d) exceptions, in order to determine if the facts fit within an exception.[6]

The first exception can be disposed of briefly. Minnesota has an obvious interest in providing a forum where an interstate sale of corporate notes and mortgages involves plaintiffs such as are involved in this case. The Arizona forum is unavailable, as a practical matter, to individuals like the

---

5. The 1976 codification of the long-arm statute was the law in effect at the time jurisdiction was asserted. That statute limited jurisdiction to persons who commit any "tort" outside Minnesota causing injury inside the state, as opposed to the current broader scope implied by use of the term "act" in the 1980 codification. In this case an actionable tort—fraud—was proved at trial and, consequently, the requirement of the earlier law was met. However, in order to give the appellant the benefit of what we interpret to be a curative amendment designed to narrow the focus of the long-arm statute to permissible constitutional limits, we have applied the 1980 exceptions to the exercise of section 543.19, subdivision 1(d), jurisdiction.

6. The third exception is obviously inapplicable to this case.

Vikses and Miland; in addition, the Arizona statutory period of limitations has run on the respondents' cause of action. Ariz.Rev. Stat.Ann. § 12–543 (1982). Richey seems not to contest Minnesota's interest in providing a forum in this case, but instead asserts that he comes within the ambit of the second exception.

The second exception represents a codification of the "minimum contacts" test of *International Shoe Co. v. State of Washington*, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945). Since 1945 the progeny of *International Shoe* have elucidated the meaning of the "minimum contacts" test, and five factors have emerged against which the defendant's actions are evaluated. The five factors are:

(1) The quantity of the contacts with the forum state,

(2) The nature and quality of the contacts,

(3) The source and connection of the cause of action with these contacts,

(4) The interest of the state providing a forum,

(5) The convenience of the parties.

*See Aftanase v. Economy Baler Co.*, 343 F.2d 187 (8th Cir. 1965). Minnesota has determined that the first three factors are "primary factors." *Marquette National Bank of Minneapolis v. Norris*, 270 N.W.2d 290, 295 (Minn.1978). Applying the primary factors to the facts at hand, we conclude that jurisdiction was properly exercised over Richey.

The first factor requires "some quantity of contacts" between the defendant and the forum. Richey was directly or indirectly involved in every transaction engaged in by Thunderbird Valley, Inc., with Minnesota residents. He recommended the type of transaction used by the company. He, or someone under his direct control, selected which lots would be encumbered by the mortgages given to the plaintiffs below. Richey, in his capacity as corporate counsel, corresponded with various attorneys and other persons in Minnesota. Finally, his own company, First Foundation Corporation, was to act as escrow agent for the mortgage satisfactions of Minnesota residents. Despite the fact that First Foundation never held the satisfactions, the documents—signed by Minnesota residents in the belief that Richey's company would protect their interests—remained in the possession and control of Richey.

In *Northwestern National Bank of St. Paul v. Kratt*, 303 Minn. 256, 226 N.W.2d 910 (1975), this court found that a single transaction, "whereby the defendant signed a guaranty in Illinois of a loan made in Minnesota to a Minnesota resident," *Marquette National Bank of Minneapolis v. Norris*, 270 N.W.2d 290, 296 (Minn.1978), constituted sufficient minimal contacts to exercise personal jurisdiction over a defendant. In this case Richey's fiduciary obligations with regard to the mortgage satisfactions signed by Minnesota residents are analogous to a guaranty. He, or his company, "guaranteed" to keep the satisfactions separate from Thunderbird Valley, Inc., until the corporate notes were paid in full. Consequently, there was a sufficient quantity of contacts to justify the exercise of jurisdiction.

In *Hunt v. Nevada State Bank*, 285 Minn. 77, 172 N.W.2d 292 (1969), *cert. denied*, 397 U.S. 1010, 90 S.Ct. 1239, 25 L.Ed.2d 423 (1970), this court indicated that where a defendant seeks to rely on Minnesota contract law to uphold the terms of agreements it enters into with state residents, due process is not offended by requiring that defendant to appear in Minnesota and defend actions arising out of those agreements. The nature and quality factor requires an examination of the potential effect of a contact in the state. *See* Note, *Due Process and Long Arm Jurisdiction in Minnesota: A Criticism of the Minimum Contacts Standard*, 5 Wm. Mitchell L.Rev. 287, 306 (1979). Therefore, where, as was the case in *Hunt*, a contact incurs the benefits and protections of the state's laws for the defendant, the assertion of jurisdiction may be proper. Richey's First Foundation Corporation would have been a third-party beneficiary of the Minnesota contracts, and he certainly would have sought refuge in

Minnesota's contract law in the event of a breach. It can then be concluded that the second factor also cuts in favor of jurisdiction.

The third factor considers the source and connection of the cause of action with the contacts of the defendant. Here, Richey's contacts are almost exclusively related to the fraud cause of action, so, although unnecessary, jurisdiction could have been predicated on this third factor as well.[7]

■ Considering these factors, as well as the secondary factors previously discussed of Minnesota's interest in providing a forum and the convenience of the parties, we conclude that—bearing in mind the circumstances of the respondents and the sophistication of the appellant—the assertion of personal jurisdiction over Richey does not violate traditional notions of fair play and substantial justice.[8]

2. The appellants argue that the respondents failed to prove at trial that the appellants defrauded them. This is essentially a sufficiency-of-the-evidence question. In *Otterness v. Horsley*, 263 N.W.2d 403, 405 (Minn.1978), this court said:

Where a party seeks a new trial on the ground that the verdict is not justified by the evidence, we will substitute our judgment for that of the jury "only if there is no evidence reasonably tending to sustain the verdict or if it is manifestly and palpably against the weight of the evidence."

7. *Hardrives, Inc. v. City of LaCrosse*, 307 Minn. 290, 240 N.W.2d 814 (1976), stands in part for the proposition that where the contacts are substantial with respect to quantity and quality, a showing of source and connection with the cause of action need not be presented.

8. Recently, in *Kopperud v. Agers*, 312 N.W.2d 443 (Minn.1981), we held in a similar action brought by different Minnesota plaintiffs against the same defendants as are named in this case that:

This is not a case of an isolated or unforeseeable contact with Minnesota. Richey purposefully availed himself of this state to carry out a scheme to defraud investors. Although his direct contacts with this state were limited, he was instrumental in setting in motion

(quoting *Templin v. Crestliner, Inc.*, 263 Minn. 149, 151, 116 N.W.2d 178, 180 (1962)). The stringent requirements of *Otterness* are not met by the appellants in this case.

It is not necessary to set out all of the elements of fraud and/or misrepresentation and test the facts against each separate element in order to determine that the jury verdict is supported by the evidence here. At trial the jury heard considerable evidence from which it could have concluded that certain facts within the knowledge of appellants were not disclosed to their agent, Flaby, about the condition of Thunderbird Valley and the security of respondents' investments, despite the fact that appellants knew unsophisticated individuals such as respondents would rely on Flaby's knowledge.[9] The respondents at trial introduced evidence of the following material omissions:

(1) Thunderbird Valley had learned in May of 1972 that the SEC was challenging their ability to finance through the use of promissory notes and mortgages.

(2) The company learned in October of 1972 that the SEC was going to institute litigation in South Dakota, and in fact did institute such litigation on November 16, 1972. The object of this litigation was to eliminate the last major source of the company's independent financing.

(3) The bank line at the First National Bank of Phoenix had been cut down from $1,000,000 to $100,000 after the bank was informed of the pending litigation.

the fraudulent scheme and in keeping it going. The cause of action arises directly out of the fraudulent transactions. Minnesota has an obvious interest in providing a forum since Minnesotans were defrauded. Moreover, convenience considerations are inconclusive because significant acts occurred both here and in Arizona. Under these circumstances, we agree with the district court that plaintiffs have made a prima facie showing of sufficient Minnesota activities to satisfy due process.

*Id.* at 445–46.

9. The general rule regarding liability for nondisclosure is contained in Restatement (Second) of Torts § 551 (1977).

(4) Key members of the management team were "jumping ship" at the time of the sales to the plaintiffs.

(5) Thunderbird Valley had a negative net worth of $393,000 on September 30, 1971, and, absent extraordinary gains on divestiture of significant corporate assets on a bulk sale basis, the company had not improved its position one iota from the previous year. Furthermore, the company's accounting practices failed to provide for reserves on certain contingent liabilities and for cancellations on assigned land contracts, thus grossly overstating the net worth of the company.

■ The appellants relied heavily on the absence of direct contact between the respondents and themselves. They assert that all representations made to the respondents were made by an independent contractor, Flaby, and therefore can give rise to no liability on the appellants' part. To the contrary, however, the appellants in making the representations to Flaby knew and intended that Flaby would be passing on his information to potential investors. The appellants who had full knowledge of the incomplete and misleading nature of their representations cannot claim to be insulated from liability. *Cf. Penn Anthracite Mining Co. v. Clarkson Securities Co.*, 205 Minn. 517, 287 N.W. 15 (1939) (defendant liable in fraud where found to have knowledge of contract signed by third party). *See also, Kopperud v. Agers*, 312 N.W.2d at 445 (Minn.1981) (defendant was "instrumental in setting in motion the fraudulent scheme and in keeping it going").

Finally, appellants contended that the reliance element of a fraud action was not met because the Vikses and Miland were only concerned about the rate of return on the notes and not the quality of Thunderbird Valley, Inc. Obviously, had the respondents received information about the true financial state of the company they might have reconsidered their decisions to purchase the corporate notes.

3. Appellants took the position that the trial judge committed error by allowing the jury to assess lump sum punitive damages against all defendants. The trial judge stated in his post-trial memorandum that such a submission was appropriate in this case because the fraud was committed through the concerted efforts of all the defendants.

■ An early Minnesota case, *Muenkel v. Muenkel*, 143 Minn. 29, 173 N.W. 184 (1919), allows the assessment of lump sum punitive damages against joint tortfeasors.[10] The respondents argue the *Muenkel* rule and point to Minn.R.Civ.P. 49.01, which requires that proposed jury instructions be submitted before the jury retires or the right to have an issue submitted is waived. Respondents correctly state that appellants' objection at trial was to the submission of punitive damages at all. Once the trial judge ruled that punitive damages would be submitted, appellants did not request a separate submission as to each defendant. Appellants, therefore, waived their right to a separate submission pursuant to Rule 49.01.

■ 4. The granting of a new trial based on newly discovered evidence requires a showing that the evidence could not have been discovered through the exercise of due diligence before the trial; that at the time of trial the evidence was not within petitioner's or his counsel's knowledge; that the evidence is not impeaching, cumulative, or doubtful; and that it is likely to produce a different result. *See, e.g., Spears v. State*, 300 N.W.2d 173, 175 (Minn. 1980); *Martin v. State*, 295 N.W.2d 76, 78 (Minn.1980); *State v. Klotter*, 274 Minn. 58, 64, 142 N.W.2d 568, 572 (1966); *Brown v. Bertrand*, 254 Minn. 175, 180–85, 94 N.W.2d 543, 548–51 (1959). In this case the appellants do not appear to have exercised due diligence.

The evidence in question is trust documents by which the signer purports to permit a trustee to file the mortgage satisfac-

---

10. For a general discussion of apportionment of punitive damages, *see* Annot. 20 A.L.R.3d 666

(1968).

tions signed at the initial sale to the respondents. In return for allowing the satisfactions to be filed, the trustee promised to make best efforts to sell the Arizona property which was the security for the corporate notes. The trustee, Surety Trust, never sold the property, but instead deeded the lots to Transamerica Corporation. Following the bankruptcy of Thunderbird Valley, the trustee in bankruptcy filed suit against the respondents to eliminate their interest in the property. The respondents never received deeds to their property from Surety Trust.

At trial, the Vikses could not recall signing the trust agreement and Miland denied signing it. However, the appellants were permitted to argue to the jury that the respondents had in fact signed the trust agreements.

■ Respondents contend that appellants should have made a more diligent search of Thunderbird Valley's records in the United States Attorney's Office in Arizona—the place where the signed trust agreements were eventually found. The appellants' failure to pursue an investigation in Arizona, where they and the records resided, for a piece of evidence they regarded as crucial, shows a lack of due diligence. This laxity persisted through two trials of the case. A new trial should not be granted on this ground.

■ 5. Finally, appellants point to several trial court rulings that they believe to have been erroneous and prejudicial. In each case, we do not agree with their position. Plaintiffs' Exhibit 41 was a letter to their attorney written by an attorney in Arizona who expressed the opinion that foreclosure on the property would be futile. Defense counsel at trial had examined respondent Vikse and criticized him for his failure to attempt to foreclose on the land. Respondents take the position that they offered Exhibit 41 for the limited purpose of showing the Vikses' good faith belief in the futility of the foreclosure remedy. The trial judge overruled the defense counsel's foundation objection when he failed to specify where the foundation was lacking. In

view of the liberal rule regarding admission of evidence in fraud actions, *see Roach v. Halvorson*, 127 Minn. 113, 148 N.W. 1080 (1914), and given the evidence's relevance and the limited purpose for which the evidence was offered, the trial court ruling, if error at all, was not prejudicial.

Defendants Exhibit O was a reprint of the federal court decision in *S. E. C. v. Thunderbird Valley, Inc.*, 356 F.Supp. 184 (D.S.D.1973). Exhibit N was the letter opinion of the Minnesota Attorney General relating to corporate promissory notes. Both exhibits are admissible under the official records self-authentication rule, Minn. R.Evid. 902(4), if they are relevant. Here, the trial court determined in its discretion that the two exhibits were irrelevant.

■ Defendants sought to introduce the exhibits to demonstrate that the corporate notes and mortgage financing was not an illegal unregistered security. The trial judge could reasonably have concluded that delving into the vagaries of securities law in a common law fraud case would have overly confused the jury.

Appellants argue that the following statements improperly inflamed the jury:

I can tell you I personally am outraged at the conduct of these defendants in this action.

\*    \*    \*    \*    \*    \*

Now, you have heard about Arizona land fraud. What is it? You know, you read about it in the newspaper. Well, here we have first hand experience to observe what it's all about. This is your opportunity to do something about it. It is your opportunity to register your vote on what you think about the land fraud perpetrated on these plaintiffs.

As a result, the trial court gave the following cautionary instruction:

There was some reference to other situations emanating from Arizona. We are not concerned about any other situations, we are only concerned about this situation, and you will disregard anything of that sort that occurred. We are only

concerned about the situation that we have before us here and resolving that fairly and equitably and honestly. That's all that we are concerned about.

Remittitur of $50,000 of the punitive damages was also ordered.

 This court has held that a "trial judge is in the best position to appraise the effect on the jury of the conduct complained of." *State v. Johnson*, 277 Minn. 230, 235, 152 N.W.2d 768, 772 (1967), *cert. denied*, 390 U.S. 990, 88 S.Ct. 1190, 20 L.Ed.2d 1297 (1968). The cautionary instruction in this case appears to have sufficiently reduced any potential prejudice caused by the summation of the respondents' counsel. *See State v. Fossen*, 282 N.W.2d 496, 503–04 (Minn.1979).

Appellants sought a special verdict that would have applied comparative fault to the compensatory damages. Denial of such a request was certainly proper because the alleged fraudulent acts occurred in 1972, six years prior to the effective date of the comparative fault act. Minn.Stat. § 604.01 (1978). Minn.R.Civ.P. 49.01 leaves the matter within the discretion of the trial court, and no abuse of that discretion is present here.

Appellants contend that it was error to instruct on fiduciary duties and obligations because the facts did not support such an instruction. The second issue in this opinion discusses the fiduciary relationships between the appellants and the respondents, and concludes that there was such a relationship. Therefore, the instruction was proper.

The trial judge's fraud instruction sets out all of the elements required by *Davis v. Re-trac Manufacturing Corp.*, 276 Minn. 116, 149 N.W.2d 37 (1967). The appellants point to additional instructions concerning their alleged material omissions that might have been given, but those given follow the recitation of the elements required by *Davis*. Therefore, the jury was properly instructed on all of the necessary elements of a fraud action.

Consequently, for the reasons set out above, the decision of the trial court is affirmed.

KELLEY, J., took no part in the consideration or decision of this case.