270 F.Supp.2d 15 (2003)
In re: VITAMINS ANTITRUST LITIGATION
Archer Daniels Midland
v.
F. Hoffman-Laroche, Ltd., et al.
Hill's Pet Nutrition
v.
F. Hoffman-Laroche, Ltd., et al.
Animal Science Products, Inc.
v.
Chinook Group, Ltd., et al.
No. 99-197 (TFH) MDL 1285. Nos. 00-1236, 00-547, 1:99-544.
United States District Court, District of Columbia.
July 7, 2003.
*17 MEMORANDUM OPINION
THOMAS F. HOGAN, Chief Judge.
Re: Cope Investments Motions to Dismiss
Pending before the Court are the motions of defendant Cope Investments Limited ("Cope") to dismiss it as defendant from the Archer Daniels Midland v. F. Hoffman-Laroche and Hill's Pet Nutrition v. F. Hoffman-Laroche actions pursuant to Fed.R.Civ.P. 12(b)(2), for lack of personal jurisdiction.[1] Also pending *18 before the court are the motions of defendants Cope, Chinook Group Limited, Chinook Group, Inc., Peter Copland and Patrick Stayner ("Chinook Defendants") from the Animal Science Products v. Chinook Group, Ltd. Class Action pursuant to Fed.R.Civ.P. 12(b)(2), for lack of personal jurisdiction,[2] and Class Plaintiffs' Motion to Sever and Transfer to Minnesota Claims Against the Chinook Defendants pursuant to Fed.R.Civ.P. 21 and 28 U.S.C. §§ 1404(a) and 1406(a).[3] Upon careful consideration of each of the foregoing motions, oppositions, replies, and the entire record herein, the Court will deny the defendants' Motions with respect to the Archer Daniels Midland v. Chinook Group, Ltd. and Hill's Pet Nutrition v. F. Hoffman-Laroche Ltd. actions, and grant Class Plaintiffs Motion with respect to the Animal Science, v. Chinook Group, Ltd. Class Action, rendering the Chinook Defendants' Motion to Dismiss moot.

I. BACKGROUND
Cope is a limited liability corporation organized and registered in Toronto, Canada, and is the sole stockholder of defendant Chinook Group Limited, also a Canadian corporation. Chinook Group Limited is the successor in interest to Chinook Group, an Ontario limited partnership, and in turn is sole shareholder of Chinook Group, Inc., a Minnesota corporation. Chinook Group Limited and Chinook Group, Inc. manufacture and sell Choline Chloride. Further, Chinook Group Limited has pled guilty to price-fixing or other antitrust violations of its predecessor in interest.
Peter Copland ("Copland") is one of the principal shareholders of Cope, served as President and Chairman of the Board of Cope, and has received paychecks from Cope since 1981. He was also Principal and Chief Executive Officer of Chinook Group, Ltd., and President of Chinook Group, Inc. William Patrick Stayner *19 ("Stayner") is similarly one of the principal shareholders of Cope, served as a director on the board of Cope, and has been paid by Cope since 1981. During the period in question, Stayner was also Vice President of Finance for several of the Chinook entities, including Cope, Chinook Group, Ltd., and Chinook Group, Inc., and served as Secretary of Cope.
Two of the motions to dismiss presently at issue pertain to individual actions filed in Illinois and Kansas, and concern jurisdiction over the Cope entity. Cope argues that it is not subject to the jurisdiction of this Court because it lacks sufficient contacts with the forum states or any United States forum, and because proceeding.with this action would violate the Due Process Clause of the United States Constitution. Plaintiffs respond that Cope is subject to jurisdiction in the forum states under a number of jurisdictional theories, including specific jurisdiction under the Clayton Act through the activities of its subsidiaries in the relevant fora, conspiracy theory jurisdiction, the effects test theory of jurisdiction, and with respect Kansas, jurisdiction under the state's long-arm statute.
The third motion to dismiss pertains to the Class Action filed in the District of Columbia, and relates to Cope, Chinook Group Limited, Chinook Group, Inc., Peter Copland and Patrick Stayner ("the Chinook Defendants"). The Chinook Defendants argue that they are not subject to the jurisdiction of this Court due to insufficient contacts with the District of Columbia. Class Plaintiffs do not dispute the lack of jurisdiction over the Chinook Defendants in the District of Columbia, but instead respond with a Motion to Sever and Transfer Claims to the District of Minnesota, the fourth motion presently at issue. Class Plaintiffs argue that all of the Chinook Defendants are subject to jurisdiction in the District of Minnesota under the Clayton Act, conspiracy theory jurisdiction, and the Minnesota long arm statute, and that severance and transfer are in the interests of justice. The Chinook Defendants respond that there are no grounds for jurisdiction in Minnesota over Cope, or over individual defendants Copland and Stayner. The Chinook Defendants do not contest Minnesota's jurisdiction over Chinook Group, Inc. or Chinook Group, Limited, and further concede the Class Plaintiffs right to sever actions against them. However, the Chinook Defendants further oppose the motion on the grounds that it would constitute a misuse of transfer provisions under sections 1404(a) and 1406(a).

II. DISCUSSION

A. Personal Jurisdiction
This Court has previously described the basic theories of personal jurisdiction in its Memorandum Opinion Re: UCB Motion to Dismiss ("UCB Opinion"), which addressed jurisdiction over UCB S.A. under most of the theories advanced in the current motions and will be referred to throughout. See Mem. Op. Re: UCB Mot. to Dismiss, October 30, 2001 ("UCB Op."). Personal jurisdiction over a defendant may either be found through general or specific jurisdiction. Id. at *2. General jurisdiction arises from a party's contacts with the forum that are unrelated to the particular claims in the litigation. Id. (citing Helicopteros Nacionales de Colombia S.A v. Hall, 466 U.S. 408, 414-17, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984)). To establish general jurisdiction, Class Plaintiffs must demonstrate that the defendants have had "continuous and systematic" general business contacts with the respective multidistrict litigation fora. Id. By contrast, specific jurisdiction attaches over a nonresident corporate or individual defendant solely for causes of action arising from the defendant's *20 contacts with that forum. Id. (citing Helicopteros, 466 U.S. at 414-17, 104 S.Ct. 1868).
With respect to the corporate defendant, Cope, the Court has addressed many of the arguments regarding jurisdiction over corporate parents of domestic subsidiaries advanced by plaintiffs in its Opinion with regard to the Court's jurisdiction over UCB. See UCB Op. at 2. As was true with respect to UCB, plaintiffs do not rely on Cope's direct contacts with the relevant fora to establish specific jurisdiction over this corporate defendant. Instead, plaintiffs argue that actions of Cope and its subsidiaries together are sufficient to establish specific personal jurisdiction on multiple bases, including: (1) Section 12 of the Clayton Act; (2) the conspiracy theory of jurisdiction; (3) the effects test; and (4) the Kansas and Minnesota long-arm statutes. See Hill's Pet Opp'n at 9-16; ADM Opp'n at 11-18.
With respect to individual defendants Copland and Stayner, plaintiffs argue that the defendants' business contacts with Minnesota are sufficient to establish personal jurisdiction, again on multiple bases, including: (1) Section 12 of the Clayton Act; (2) the conspiracy theory of jurisdiction; and (3) the Minnesota longarm statute.
Severance and transfer of Class Plaintiffs' claims to the District of Minnesota would require a finding that personal jurisdiction may be had over the Chinook Defendants in that forum. See discussion, § II.B, below. The Court will therefore consider personal jurisdiction over the defendants in the District of Minnesota along with its analysis of personal jurisdiction in Illinois and Kansas.
Plaintiffs must establish personal jurisdiction over both the corporate and individual defendants in each of the fora by a preponderance of the evidence as jurisdictional discovery has been completed. See UCB Op. at 3 (citing Shapiro Lifschitz & Schram, P.C. v. Hazard, 24 F.Supp.2d 66, 70 (D.D.C.1998)).[4]

1. Section 12 of the Clayton Act
Section 12 of the Clayton Act provides that "[a]ny suit, action, or proceeding under the antitrust laws against a corporation may be brought not only in the judicial district whereof it is an inhabitant, but also in any district wherein it may be found or transacts business; and all process in such cases may be served in the district of which it is an inhabitant, or wherever it may be found." 15 U.S.C. § 22. In this case, plaintiffs contend that Cope transacted business in Illinois, Kansas, and Minnesota through the activities of its United States subsidiaries. Plaintiffs further contend that Copland and Stayner, acting as co-conspirators on behalf of their employers, had numerous contacts with Cope's Minnesota-based subsidiary.

a. Copland and Stayner:
Referring to the Court's ruling with respect to UCB, Class Plaintiffs contend that Copland's and Stayner's business contacts with the Chinook Group, Inc. Minnesota offices and their participation in conspiracy meetings provide a basis for personal jurisdiction over them under Section 12 of the Clayton Act. However, a distinction is *21 made between personal jurisdiction over a foreign individual and a foreign corporation in antitrust actions. United Phosphorus, Ltd, v. Angus Chemical Co., 43 F.Supp.2d 904, 911 (N.D.Ill.1999) (finding that other jurisdictional theories must be applied); Catrone v. Ogden Suffolk Downs, Inc., 647 F.Supp. 850, 855-56 (D.Mass. 1986) (applying Federal Rule of Civil Procedure 4(K)(2)). By its own terms, Section 12 of the Clayton Act is directed only at "corporation[s]" and not at individuals. 15 U.S.C. § 22. Other courts reaching this question have noted that the service of process provisions under Rule 4 of the Federal Rules of Civil Procedure similarly make distinctions between corporate and individual defendants, and therefore courts must consider state long arm statutes or other methods of obtaining jurisdiction over individual defendants. See United Phosphorus, 43 F.Supp.2d at 911; Catrone, 647 F.Supp. at 856. Accordingly, the Court finds that Section 12 of the Clayton Act does not provide a basis for personal jurisdiction over individual defendants Copland and Stayner. However, the Court will address other grounds asserted by plaintiffs for obtaining personal jurisdiction over the individual defendants, below.

b. Cope
The issue of determining whether to exercise jurisdiction over a parent corporation based on the acts of its domestic subsidiaries under Section 12 of the Clayton Act has already been addressed by the Court. See UCB Op. at 3-14. There, the Court noted that to reach a parent, a "control" relationship must be found to exist between the defendant and its subsidiaries. Id. at *3 (quoting Chrysler Corp. v. Gen. Motors Corp., 589 F.Supp. 1182, 1195, 1200 (D.D.C.1984)). Further "[t]he level of control exercised by the parent company must be such that the parent company itself is actually transacting business in the forum through the subsidiary rather than the subsidiary transacting its own independent business." Id. In deciding whether sufficient control exists to reach such corporate parents, courts consider:
(1) whether the subsidiary performs `business activities in a district, for example, sales and servicings, that in a less elaborate corporate scheme the absent corporation would perform directly by its own branch offices or agents'; (2) whether the subsidiary and its parent are partners in `world-wide business competition'; (3) whether the parent has the capacity `to influence decisions of the subsidiary or affiliate that might have antitrust consequences,' e.g., `[controlling stock ownership and interlocking directorates'; (4) `the part that the subsidiary or affiliated corporation plays in the over-all business activity of the absent corporation'; (5) `the existence of an integrated sales system involving manufacturing, trading, and sales corporations'; (6) `[t]he transfer of personnel back and forth between the absent corporation and its subsidiary'; (7) `the presentation of a common marketing image by the related corporations ... [(Especially true when those corporations hold themselves out to the public as a single entity that is conveniently departmentalized either nationally or worldwide[)]'; (8) `the granting of an exclusive distributorship by the absent corporation to its subsidiary or affiliate'; (9) Svhether the subsidiary pays cash for products sold or services rendered to it by the parent'; and (10) `whether separate books, bank accounts, tax returns, financial statements and the like are kept.'
Id. (quoting Chrysler, 589 F.Supp. at 1200-01).
*22 Absent a finding of that the control relation is sufficient "to treat the parent and subsidiary as a single entity," attributing the contact of the subsidiary to the parent for purposes of jurisdiction would exceed due process limitations. Id. Therefore, the dispositive question for purposes of finding jurisdiction over Cope under Section 12 of the Clayton Act is whether Cope dominates or controls its subsidiaries such that attribution of the subsidiaries' business activities in the relevant fora to Cope is consistent with due process.[5] Based upon the evidence presented by the parties, the Court finds that there is sufficient evidence to support plaintiffs' allegations of control by Cope.
First, there is significant overlap between the Boards of Directors and officers of Cope and the Boards of Directors and officers of its subsidiaries, Chinook Group Ltd. and Chinook Group, Inc., during the period of the conspiracy. Peter Copland was the president and Chairman of the Board of Cope, and served in both capacities during the period in question. See Hill's Pet Opp'n, Ex. 2, Copland Dep. at 2-9;[6] Ex. 14, Minutes of Annual Meeting, March 15, 1988; Ex. 15, Meeting of Board of Directors, March 15, 1988; Ex. 16, Minutes of Annual Meeting, Jan. 18, 1990; Ex. 17, Minutes of Meeting of Board of Directors, Nov. 13, 1996; Ex. 18, Dividend Resolution, April 15, 1998. Copland was also the sole director and the president of defendant Chinook Group, Inc. during the period. See Hill's Pet Opp'n Ex. 13, Consent Resolution; ADM Opp'n Ex. 3, Hockin Dep. at 59-60. Copland further served as a director and officer of Chinook Group Management, Limited during the period. See ADM Opp'n Ex. 1, Stayner Dep. at 37; Hill's Pet Opp'n Ex. 21, Minutes of Annual Shareholders' Meeting. Patrick Stayner, the vice-president for finance of Cope and another of its directors, was also vice-president for finance of all three of the other entities. See ADM Opp'n Ex. 1, Stayner Dep. at 167-68; Ex. 3, Hockin Dep. at 59-60; Hill's Pet Opp'n Ex 4, Stayner Dep. at 30. Copland and Stayner were also officers and directors of Chinook Group, Ltd. See ADM Opp'n Ex. 1, Stayner Dep. at 332; Ex. 3, Hockin Dep. at 62; Hill's Pet Opp'n Ex. 20, Minutes of Annual Shareholders' Meeting, Jan. 30, 1992; Ex. 17, Minutes of Meeting of Board of Directors, Nov. 13, 1996. Cope's third employee, Russell Cosburn, was vice-president of sales for at least two of the entities, Cope Investments, Ltd., the holding company, and Chinook Group, Ltd., the operating entity, until he left the companies in 1996. Ex. 15, Meeting of Board of Directors, March 15, 1988; Ex. 16, Minutes of Annual Meeting, Jan. 18, 1990.
In other words, all three of the aforementioned employees of Cope, namely Copland, Stayner, and Cosburn, served as President and Vice Presidents, respectively, of Cope, the holding entity. Two of the three, Copland and Stayner, served in those roles for Chinook Group Management Ltd., the managing entity, which, along with Cope, is an entity above the manufacturing facilities. Two of the three also served in the same positions in Chinook Group Inc., which manufactures choline chloride, and all three held those roles *23 in Chinook Group Ltd., which pled guilty to price-fixing. Copland and Stayner were directors of all four of the entities. See Hill's Pet Opp'n Ex 2, Copland Dep. at 2-9; Hill's Pet Opp'n Ex 4, Stayner Dep. at 30, 37; Hill's Pet Opp'n Exs. 14-17 (minutes of board meetings for Cope 1988, 1990, 1996); ADM Opp'n Ex. 3, Hockin Dep. at 62. Further, the record shows that these officer/directors were placed in equivalent positions in the parent and managing entities, which were created for tax purposes, "because a company has to have officers and directors." Hill's Pet Opp'n Ex 4, Stayner Dep. at 37. Indeed, Copland, when asked what positions he held in the operating entity during the relevant period, stated "I can't even tell you if we had separate officers for it." Hill's Pet Opp'n Ex 2, Copland Dep. at 11. Cope has no corporate operations separate from its subsidiaries. Id. This core group undoubtedly had "tremendous influence" over the operations of the Chinook manufacturing entities. See UCB Op. at 7 (noting that despite only one overlapping director, influence could be found where employees of the parent made up the remainder of the board of the subsidiary and were members of its executive committee).
Second, Cope's president and chairman, Copeland, hired all of Chinook's senior management, who reported directly to him. With the input of Patrick Stayner, Copland also made decisions regarding firing of key management employees. See Hill's Pet Opp'n Ex. 2, Copland Dep. at 2-9; Hill's Pet Opp'n Ex. 4, Stayner Dep. at 44, 47. The management services of Cope employees, including the core group described above, were then provided to the Chinook operating subsidiaries through contracts with another intermediate, wholly-owned subsidiary of Cope. See Class Mot. Ex. M (contracts between Cope, Chinook Group Management Ltd., and Chinook Group Ltd.). Further, at least with respect to personnel issues, Copland seems to have dealt with "Chinook" managers and employees through his position as president of Cope, and without regard to any separation between the various legal entities. See Class Mot. Ex. N (sending a disciplinary letter to Cosburn on Cope letterhead, and describing Cosburn's position as being "with Chinook"); see also Hill's Pet Opp'n Ex. 2, Copland Dep. at 115 (asserting that Copland gave Cosburn and Stayner "permission" to attend conspiracy meetings). Also, the paychecks received by the management personnel of the operating entities came from Cope. See Class Mot. Ex. I (Cope tax forms).
Third, Copland admits that he "ran" Chinook Group Ltd. during at least a portion the conspiracy period. See ADM Opp'n Ex. 2, Copland Dep. at 11. As noted above, Cope employees Stayner and Cosburn were working for the Chinook companies, and serving as corporate officers. See ADM Opp'n Ex. 1, Stayner Dep. at 190. In fact, the management of the operating entities was provided by Cope employees who were contracted out through the management subsidiary. See Class Mot. Ex. M (contracts between Cope, Chinook Group Management Ltd., and Chinook Group Ltd.). In essence, through these arrangements, Cope retained control over the management of the operational entities, Chinook Group, Inc. and Chinook Group Ltd.
Fourth, Chinook Group Management Limited and Chinook Group Limited, the wholly-owned entities separating Cope from the operational entities during the period of the conspiracy, were put in place solely to reduce tax liability. See, e.g., ADM Opp'n Ex. 1, Stayner Dep. at 190; see also id. at 36-37 ("This whole thing was a tax driven thing, yes."). Officers and Directors were put into place in both *24 companies merely to comply with statutory obligations; consequently, the two entities have no corporate records other than the minutes of requisite yearly board meetings. See id. at 37, 332. Further, while the services of management personnel were, at least theoretically, funneled through Chinook Group Management Limited, the salaries of the employees the management entity was providing by contract to the operational entities were being paid by Cope. See Class Mot. Ex. M (contracts between Cope, Chinook Group Management Ltd., and Chinook Group Ltd.); Class Mot. Ex. I (Cope tax forms).
Fifth, Cope's financial decisions, at least with respect to the declaration of dividends, were based on the financial performance of the Chinook companies, and the monies needed for Chinook companies' operations. See ADM Opp'n Ex. 2, Copland Dep. at 77. Cope paid its employees through monies received under a management agreement with one wholly-owned Chinook subsidiary and through dividends received from another. See Hill's Pet Opp'n Ex. 4, Stayner Dep. at 167-68.
Despite this showing of control, Cope contends that plaintiffs place too much emphasis on the fact that Cope was "sole shareholder" of Chinook Group limited, noting that it was "twice removed" from the subsidiaries' choline chloride operations. Cope IL Reply at 3 & n. 3; Cope KS Reply at 3 & n. 3. Cope attempts to distinguish itself from the ruling in UCB, where the parent itself was selling and marketing choline chloride, on the grounds that "[w]ithout its subsidiaries, Cope Investments could not `perform directly by its own branch offices or agents' or `compete in' the sale and marketing of choline chloride." Cope KS Reply at 6 (quoting UCB Op. at *4-5). However, as the plaintiffs argue, that Cope had no operations, was not known to choline chloride customers, and could not have been competed in sales or marketing without its subsidiaries may also be read as an indication that the Cope and the Chinook entities were intertwined.
Further, Cope makes no attempt to assert that overlapping board members, officers or employees "carefully differentiate their role[s]" in the various entities, or that the subsidiaries are free to disregard advice from managing directors of the parent, as was argued, albeit unsuccessfully, in UCB. See UCB Op. at 10. In that case, the Court noted that UCB S.A. had shown that only one person was a member of the boards of both the parent and its three indirectly owned U.S. subsidiaries, and that the subsidiaries' boards were given latitude in small decisions relating to day-to-day management of their corporations. Id. The Court found this evidence insufficient to refute the showing of control in light of the fact that the parent corporation retained control to influence and reverse the boards of the subsidiaries on most issues. Id. at 10-11. This finding was further supported by the fact that the "single" overlapping board member was the Chairman and President of the parent corporation, and the remaining board members of the domestic subsidiaries were "high-level executives" employed by the parent. Id, at 11.
In this case, with respect to Cope, the management of the Chinook entities consisted of the same core group of people, Cope, Stayner, and Cosburn, who serve as President and Vice Presidents of Sales and of Finance, respectively, and all of whom are Cope employees, See, e.g., Hill's Pet Opp'n Ex. 2, Copland Dep. at 2-9 (Copland was President and Chairman of Board of Cope, Chairman and sole director of Chinook Group, Inc.); Hill's Pet Opp'n Ex. 4, Stayner Dep. at 37 (Stayner was Vice President of Finance and director for *25 Cope and Vice President for Finance and Secretary of Chinook Group Management Ltd., Chinook Group Ltd., and Chinook Group, Inc.); ADM Opp'n Ex. 3, Hockin Dep. at 62 (Cosburn was VP Sales for Chinook Group, Ltd.); Hill's Pet Opp'n Exs. 14-17, Minutes of Board and Shareholder Meetings for Cope, 1988, 1990, 1996, (Copland and Stayner among directors, Copland President, Stayner Vice President of Finance and Secretary, Cosburn Vice President of Sales). While, there is technically only one overlapping director between Cope and Chinook Group, Inc., the Minnesota manufacturing facility, that director is Copland, who was a Director and President of all of the Chinook entities during the relevant periods. Hill's Pet Opp'n Ex. 2, Copland Dep. at 2-9. Importantly, Copland is the only director of Chinook Group Inc. ADM Opp'n Ex. 3, Hockin Dep. at 62 (Copland "is" the board of directors). Additionally, Cope provides the core employees who sit on the Cope board with Copland and serve as officers of the operational entities, including Chinook Group Ltd., the Chinook entity which has pled guilty to antitrust charges. See Class Mot. Ex. M (contracts between Cope, Chinook Group Management Ltd., and Chinook Group Ltd.); Class Mot. Ex. I (Cope tax forms).
As noted above, the Court's opinion with respect to UCB was based in part on the fact that the single overlapping director was the Chairman and President of the parent, and the remaining directors of the subsidiary corporations were "high-level executives" employed by the parent, "mak[ing] it hard to believe that they do not base their decisions on what is ultimately beneficial for [the parent]." See UCB Op. at 11. Such concerns seem all the more likely to apply where the executives of the subsidiary are employed and paid by a parent, and serve as directors and officers of the parent and the intermediate subsidiaries. Indeed, Cope makes no argument that roles were differentiated or that the subsidiaries were not affected by the overlapping influence of the core group of officer/directors. Further, while Cope was legally "twice-removed" from its subsidiaries, those two levels consist of Cope, the entity that hired all of the management employees, and Chinook Management Ltd., who contracted the management services of Cope employees to the subsidiaries. See Class Mot. Ex. M (contracts between Cope, Chinook Group Management Ltd., and Chinook Group Ltd.); Class Mot. Ex. I (Cope tax forms).
Finally, Cope argues that plaintiffs essentially try to pierce the corporate veil and reach them through "alter ego" theories. Cope cites United States v. Bestfoods, 524 U.S. 51, 61, 118 S.Ct. 1876, 141 L.Ed.2d 43 (1998), for the proposition that duplication of some or all directors or executive officers between entities does not justify piercing the corporate veil absent a showing that the corporation actually operated the subsidiary facilities. Cope IL Reply at 2-4; Cope KS Reply at 2-4. Cope is correct that the mere existence of a parent-subsidiary relationship, or the existence of control of a subsidiary through stock ownership, does not make the parent liable for the torts of its affiliate. See Bestfoods, 524 U.S. at 61, 118 S.Ct. 1876.
However, as the Supreme Court noted in the same opinion, "there is an equally fundamental principle of corporate law, applicable to the parent-subsidiary relationship as well as generally, that the corporate veil may be pierced and the shareholder held liable for the corporation's conduct when, inter alia, the corporate form would otherwise be misused to accomplish certain wrongful purposes, most notably fraud, on the shareholder's behalf." Id. at 62-63, 118 S.Ct. 1876 (citing Chicago, M. & St. P.R. Co. v. Minneapolis *26 Civic and Commerce Assn., 247 U.S. 490, 501, 38 S.Ct. 553, 62 L.Ed. 1229 (1918)) (principles of corporate separateness "have been plainly and repeatedly held not applicable where stock ownership has been resorted to, not for the purpose of participating in the affairs of a corporation in the normal and usual manner [such as the election of directors and the making of bylaws], but for the purpose ... of controlling a subsidiary company so that it may be used as a mere agency or instrumentality of the owning company"). As described above, Cope is clearly more than a "stockholder" in its wholly-owned subsidiaries; the directors and officers of Cope serve as directors and officers of each of the Chinook entities and are intimately involved with the management and operation of the business.[7]
Cope is correct that corporate veil piercing analysis includes consideration of factors such as "undercapitalization, misuse or intermingling of corporate funds, absence of separate corporate records, and the use of the corporation as a facade for a shareholder." See Cope KS Reply at 3 (quoting Amoco Chemicals Corp. v. Bach, 222 Kan. 589, 567 P.2d 1337, 1341 (1977)). However, in addition to such factors, the principle announced by the Supreme Court in Bestfoods has also been followed by virtually all jurisdictions, including Illinois, Kansas, and Minnesota. These jurisdictions allow courts to reach a corporate parent where the corporate entity has been disregarded, either through veil piercing or through specific provisions of their individual long arm statutes. See, e.g., Cooper v. Lakewood Engineering and Mfg. Co., 45 F.3d 243 (8th Cir.1995) (under Minnesota law, a parent and its subsidiary may be considered one entity if they are sufficiently intertwined such that one is merely an instrumentality of the other); Innkeepers' Telemanagement & Equipment Corp. v. Hummert Mgmt. Group, Inc., 841 F.Supp. 241 (N.D.Ill. 1993) (corporate entity may be disregarded where corporation is so controlled and its affairs so conducted that it is a mere instrumentality of the other corporation, and where adhering to corporate fiction would constitute sanctioning fraud or promoting injustice); UAW v. Cardwell Mfg. Co., Inc., 416 F.Supp. 1267 (D.Kan.1976) (concept or fiction of distinct entity will not be recognized where one corporation is so organized and controlled and its business conducted in such a manner as to make it a mere agency, instrumentality, agent, or alter ego of another corporation). While the Court notes that the various jurisdictions all provide specific veil piercing or alter ego tests for reaching parent corporations, a deeper inquiry into those methods is not necessary under the current inquiry. The law regarding reaching a parent corporation for purposes of jurisdiction under the Clayton Act are not in dispute, and have been applied herein. See also UCB Op. at 3-6.
Given the totality of the evidence in the record, the Court finds that Cope sufficiently controlled its Canadian and U.S. subsidiaries to attribute the business activities of the subsidiaries to the parent company for purposes of establishing personal jurisdiction under Section 12 of the Clayton Act in Illinois, Kansas, and Minnesota. Taking into account the fact that the Chinook subsidiaries do not contest jurisdiction over them in those fora, and because the Court finds that Cope controlled these *27 subsidiaries such that they were not independent entities but were rather a part of a single Chinook group entity, the Court finds that Cope "transacted business" in these fora within the meaning of Section 12 of the Clayton Act. Moreover, in light of the all of the foregoing, the exercise of personal jurisdiction over this defendant "does not offend traditional notions of fair play and substantial justice" and thus comports with due process. International Shoe Co. v. Washington, 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945). Cope, through its control of its subsidiaries, more than satisfies the "minimum contacts" standard with respect to Illinois, Kansas, and Minnesota, and should therefore "reasonably anticipate being hauled into court" in these fora. World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 297, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980). Accordingly, defendant's Motion to Dismiss is denied with respect to Illinois and Kansas. The Court further finds that Minnesota would be able to exercise personal jurisdiction over defendant Cope should the court determine that severance and transfer of Class Plaintiffs claims were appropriate under the circumstances.

2. Conspiracy Theory
As noted in the Court's UCB Opinion, "under the conspiracy theory, jurisdiction may [generally] be exercised over a defendant in a forum if: (1) the defendant and one or more persons conspired to do something; (2) that they could reasonably expect to lead to consequences in a particular forum; (3) one co-conspirator commits overt acts in furtherance of the conspiracy; and (4) those acts are a type which, if committed by a nonresident, would subject the nonresident to personal jurisdiction under the long-arm statute of the forum state." UCB Op. at *14; see also Cawley v. Bloch, 544 F.Supp. 133, 135 (D.Md. 1982). Plaintiffs contend that corporate defendant Cope is subject to personal jurisdiction in Illinois and Kansas under the foregoing theory. Class Plaintiffs also contend that Cope, Copland, and Stayner are subject to conspiracy theory jurisdiction in Minnesota.

a. Illinois
As discussed in this Court's earlier rulings on personal jurisdiction,[8] Illinois courts have upheld the validity of the conspiracy theory of jurisdiction. See, e.g., Cameron v. Owens-Corning Fiberglas Corp., 296 Ill.App.3d 978, 231 Ill.Dec. 55, 695 N.E.2d 572, 577 (1998) (upholding jurisdiction over British corporation based on allegations that it conspired with other companies that performed acts in Illinois). To establish personal jurisdiction over a nonresident defendant in Illinois based on the conspiracy theory, the plaintiff must allege an actionable conspiracy and a substantial act in furtherance of the conspiracy performed in Illinois by one of the coconspirators. See Textor v. Bd. of Regents of N. III. Univ., 711 F.2d 1387, 1393 (7th Cir. 1983) (actions by one conspiracy participant in Illinois "provide the requisite minimum contacts between the remaining members of the conspiracy and the [forum state]"); Zivitz v. Greenburg, No. 98C5350, 1999 WL 984397, at *6 (N.D.Ill. Oct.25, 1999) (exercise of conspiracy jurisdiction in forum state over nonresident defendants comports with due process).
As stated above, Chinook Group Ltd., as successor in interest to the Chinook Group operating entity, has pled guilty to fixing prices and allocating customers and volumes *28 of choline chloride sold in the U.S. and elsewhere. See ADM Opp'n Ex. 9, Chinook Plea Agreement. Further, the Court finds that there is sufficient evidence in the record to support plaintiffs' allegations that Cope was involved in the alleged all-vitamins conspiracy, through acts in furtherance of the conspiracy that were authorized or undertaken for the benefit of Cope.[9]
For example, Russell Cosburn, an employee of Cope who served as Vice President of Sales for virtually all of the Chinook Group entities, admits that he participated in the conspiracy and says that he reported such meetings and agreements extensively to Copland, President and Director of Cope. See Hill's Pet Opp'n Ex. 3, Cosburn Dep. at 61-67, 116-118, 262-64. Copland, for his part, admits that he knew of the meetings where price fixing and customer allocation agreements were being discussed, and in fact that he gave Cosburn and Stayner "permission" to attend the meetings. Hill's Pet Opp'n Ex. 2, Copland Dep. at 115. Copeland never reported the activities to authorities, and according to Cosburn, instead encouraged Cope employees to attend meetings and even host meetings in Canada, because of concerns regarding U.S. antitrust laws. ADM Opp'n Ex. 4, Cosburn Dep. at 43-44, 65-67.
Further, as plaintiffs note, this Court has already recognized that the numerous acts of co-conspirators performed in Illinois are sufficient to satisfy the conspiracy theory requirements for jurisdiction.[10] Chinook itself sold choline chloride in Illinois, according to Peter Copland, and Illinois was the site of a meeting in furtherance of the conspiracy. See ADM Opp'n Ex. 5, Hilling Dep. at 369-71, 446, 517-18. Thus, based upon the evidence presented by plaintiffs, the Court finds that personal jurisdiction over Cope in Illinois based upon the conspiracy theory is appropriate.

b. Kansas
Addressing conspiracy theory jurisdiction in Kansas, this Court noted that "the commission by a co-conspirator of tortious acts that have foreseeable consequences in Kansas will subject a defendant who is a participant in the conspiracy to jurisdiction in Kansas." UCB Op. at 21. When considering jurisdiction over a coconspirator, the Court noted that Chinook's substantial sales to Hill's Pet Nutrition over a four-year period of time made *29 it foreseeable that adverse consequences would be felt in Kansas as the result of these sales of price-fixed choline to purchasers within the State. See UCB Op. at 21 (citing Purchase Orders from Hill's Pet Nutrition in Kansas to Chinook Group in Canada for 1993-1997); see also Hill's Pet Opp'n Ex. 23 (including Purchase Orders). The Court found that UCB should anticipate that it could be hauled into Court in Kansas based upon the business contacts and sales of its co-conspirator, Cope. See UCB Op. at 21. Cope, no less than UCB, should anticipate that it could be hauled into Court in Kansas based upon the business contacts and sales of its subsidiaries in that State.
Defendants argue that conspiracy theory jurisdiction cannot be found consistent with due process as there is no evidence that Cope received any benefits from the acts of its subsidiaries "other than those incidental to normal parent/subsidiary relationships." Cope IL Mem. at 16; Cope KS Mem. at 16. However, as the Court has already found that Cope was in a control relationship with its subsidiaries, such arguments fail. Defendants further contend that plaintiffs have produced insufficient evidence that Cope directed any of the acts in connection with the conspiracy. Id. These arguments are also unavailing. As detailed above, for the purpose of establishing jurisdiction, the Court is satisfied with the evidence in the record respecting Cope's participation in a conspiracy and its control over its subsidiaries. The Court therefore finds that Cope is subject to jurisdiction pursuant to the conspiracy theory in both Illinois and Kansas.

c. Minnesota
Plaintiffs contend that conspiracy jurisdiction may be found over Cope, Copland, and Stayner in Minnesota. As described in this Court's UCB Opinion, Minnesota courts recognize jurisdiction over a nonresident defendant based on that nonresident's contacts with Minnesota to participate in a tortious conspiracy. UCB Op. at *18 (citing Hunt v. Nevada State Bank, 285 Minn. 77, 172 N.W.2d 292, 312 (1969)). Under this theory, sufficient contacts to satisfy due process are found where a defendant has direct or indirect involvement in the fraudulent transactions with Minnesota residents. Id. at 18-19; Vikse v. Flaby, 316 N.W.2d 276, 281-83 (Minn.1982). "Accordingly, in Minnesota, jurisdiction over a nonresident defendant is appropriate under the conspiracy theory if: `(1) jurisdiction can, under the traditional tests ... be asserted over a "resident" defendant (i.e. one with sufficient ties to the state); (2) the plaintiff can demonstrate the existence of a conspiracy in which the non-resident defendant and the resident defendant participated; and (3) an overt act in furtherance of the conspiracy took place within the state.'" UCB Op. at *19 (quoting Clim-A-Tech Indus., Inc. v. Quadna, Inc., Civ. No. 99-523, slip op. at 14 (D.Minn. May 18, 2000)).

i. Conspiracy Jurisdiction over Cope
In the Motion to Sever and Transfer, Class Plaintiffs point out that this Court found conspiracy theory jurisdiction over UCB S.A. based in part on co-conspirator Chinook Group, Inc.'s activities in Minnesota. Class Reply at 16. In the UCB Opinion, this Court recognized that Chinook Group, Inc., a subsidiary of Cope, is a Minnesota corporation with offices in Minnesota, which until recently owned a plant in Minnesota that converted liquid choline into dry choline. See UCB Op. at 19 (citing Toll Manufacturing Agreement between Chinook and BASF AG). The Court also recognized that John Kennedy, who worked for Chinook during the relevant period, and who pleaded guilty to participating in the choline chloride conspiracy *30 was based in Minnesota. Id. (citing Cosburn Tr. at 201-202). Class Plaintiffs further remind the Court that the UCB opinion included evidence that a conspiratorial meeting was allegedly held in Minnesota in September of 1995, which was preceded by a series of other meetings, phone calls, and faxes. See id. (citing Coenen Dep. at 145-46 (admitting that the purpose of the St. Paul meeting was to discuss "acquisitions or partnering in choline chloride" and that this meeting was preceded and followed by many conversations about market allocation)).
As Class Plaintiffs point out, Cope could foresee that its activities would adversely affect Minnesota residents, as one of Cope's manufacturing subsidiaries was headquartered in Minnesota, key Chinook employees were headquartered in Minnesota, and the Minnesota entity was selling price-fixed products in the state. See UCB Op. at 19. Plaintiffs provide additional evidence regarding the participation of defendants Copland and Stayner in conspiratorial meetings in connection with the Minnesota subsidiary, as described below. However, given the Court's previous ruling and its current finding that Cope exercised control over its subsidiaries, no further evidence is necessary with respect specifically to corporate defendant Cope. Accordingly, the Court finds that plaintiffs have met their burden of establishing, by a preponderance of the evidence, conspiracy jurisdiction over Cope in Minnesota.

ii. Copland and Stayner
As described above, Copland is President of Chinook Group Inc., the Minnesota subsidiary, and its sole Director. Stayner is the Vice President of Finance of that entity. Class Plaintiffs contend that at all times relevant to the litigation, both served as officers and directors of Chinook Group, Ltd., the entity that pled guilty to price fixing. Not surprisingly, both traveled to the Minnesota offices and plant on various occasions for business purposes, and exchanged information with employees by telephone and by other means. See, e.g., Class Mot. Ex. H, Copland Dep. at 92; Class Mot. Ex. E, Stayner Dep. at 346. Most pertinent to the present inquiry, Class Plaintiffs further allege that both participated in at least two conspiracy meetings. See Class Reply at 17. Further, Class Plaintiffs contend that both were aware of the participation of other Chinook officers in the conspiracy, and did nothing to intervene. See Class Mot. at 6 (citing Ex. E, Stayner Dep. at 80-117, 160-167, 273, 332-334; Ex. H, Copland Dep. At 95-96, 114-117, 130-131).
The record reflects that Stayner was present at a minimum of two meetings where Chinook employees and others discussed the conspiracy. See Class Mot. Ex. E, Stayner Dep. at 80-89, 96-102. Stayner testified that he attended those meetings at the request of Copland, and reported back to Copland after both of the meetings regarding the participation of Chinook employee Cosburn in conspiratorial activities. Id. While Stayner's testimony suggests that it was Copland's responsibility to ensure that Cosburn cease his involvement in the conspiratorial activities, and that Stayner himself participated in such meetings only as an "observer," other evidence, as outlined below, suggests that his participation was of a much more active nature, both with respect to these meetings and in other communications regarding anticompetitive agreements among choline chloride producers.
For example, according to the testimony and affidavit of DuCon employee Lindell Hilling, who pled guilty to price fixing and customer allocation of choline chloride, Stayner attended and actively participated *31 in additional meetings, solicited information regarding customer allocation, and verified that the Chinook entities were living up to conspiratorial agreements with respect to customers and prices. See ADM Opp'n Ex. 5, Hilling Dep. at 509-13, 517-19, 522-523; Class Mot. Ex. 0, Hilling Aff. at ¶¶ 5, 8, 27. Further, while John Kennedy reported at all relevant times to Copland, the evidence shows that Kennedy reported information regarding conspiratorial activities to Stayner as well as to other Chinook officers. See Class Mot. Ex. V, Kennedy Dep. at 361, 439, 451; ADM Opp'n, Ex. 6 (internal memorandum). Even Stayner himself suggests that he may have been present at other meetings where anti-competitive conduct was discussed. See Class Mot. Ex. E, Stayner Dep. at 114-117. The Court finds the foregoing evidence persuasive despite Stayner's assertions that he was a mere observer at two meetings, and potentially others where he simply did not pay attention to marketing discussions. See id.
Similarly, Copland testifies to knowledge of conspiratorial activities on the behalf of Chinook employees, but characterized his participation as giving Cosburn and Stayner "permission" to attend the meetings, as noted above. Class Mot. Ex. H, Copland Dep. at 115. At a minimum, Copeland never reported the activities to authorities. However, according to Cosburn, Copland encouraged Cope employees to attend meetings, and told Cosburn to host meetings in Canada and avoid keeping records, because of concerns regarding U.S. antitrust laws. ADM Opp'n Ex. 4, Cosburn Dep. at 43-44, 65-67. Further, the record suggests that Copland attended at least some meetings where price fixing and customer allocation agreements were reached or discussed, and received both oral and written reports regarding conspiracy activities. See ADM Opp'n Ex. 5, Hilling Dep. at 509-517; Class Mot. Ex. 0, Hilling Aff. At ¶¶ 8, 27; ADM Opp'n Ex. 6 (internal memorandum). In fact, Cosburn suggests that his attendance at conspiratorial meetings was only at Copland's direction, and that on at least one occasion, co-conspirator Kennedy called Copland to receive "permission or direction" with respect to anti-competitive agreements under discussion at that meeting. Hill's Pet Opp'n Ex. 3, Cosburn Dep. at 51, 142. The record is thus sufficient to find that both Copland and Stayner participated directly or indirectly in a conspiracy which had effects in Minnesota, and therefore, that both individual defendants are subject to conspiracy theory jurisdiction in Minnesota.
Defendants argue that no Complaint states a jurisdictional claim over the individual defendants and that Class Plaintiffs have failed to state grounds for jurisdiction over them. See Chinook Opp'n at 6 n. 5.[11] Class Plaintiffs respond that both Copland and Stayner were alleged to be co-conspirators acting on behalf of their employers, and to have done acts in the United States (including Minnesota) that have had an anticompetitive effect in the United States (including Minnesota). Class Reply at 17 (citing Third Consolidated Amended Class Action Complaint, ¶¶ 12, 21-22). As the Chinook Defendants note, all of the relevant defendants had received service of the Third Amended Class Action Complaint by May 15, 2000. Chinook Response at 3. Further, as noted above, Class *32 Plaintiffs have also proposed several bases for personal jurisdiction over the individual defendants in their Motion to Sever and Transfer. The Court therefore finds that both Copland and Stayner are subject to conspiracy theory jurisdiction in Minnesota.

3. Effects Test
Plaintiffs also argue that Cope is subject to jurisdiction under the "effects test" theory of jurisdiction in both Illinois and Kansas. As with other jurisdictional theories asserted by the various plaintiffs, the Court addressed the effects test in its ruling with regard to UCB. See UCB Op. at 24-28. In that Opinion, the Court described the origin of the effects test, which began with the Supreme Court's finding that a minimum contacts analysis may be satisfied "even when the defendant's only contact with the forum was calculated to cause and did cause injurious effects to plaintiffs in the forum state." UCB Op. at 24 & n. 20 (citing Colder v. Jones, 465 U.S. 783, 789, 104 S.Ct. 1482, 79 L.Ed.2d 804 (1984)). This Court's ruling in the UCB Opinion was also informed by recent precedent evaluating minimum contacts in the price-fixing context, which examined "the nexus among the forum state, the foreign corporation, and the inflated price paid by the forum's consumers for the price-fixed product." Id. at 24 (citing Execu-Tech Bus. Sys., Inc. v. New Oji Paper Co., 752 So.2d 582, 585 (Fla.), cert, denied, 531 U.S. 818, 121 S.Ct. 58, 148 L.Ed.2d 25 (2000)).
As noted in the UCB Opinion, the Illinois construction of the "effects test" is among the most broad, and provides that a tort-feasor need only commit a tort against an Illinois business such that the injury is felt in Illinois in order to satisfy the minimum contacts requirement. Id. (citing Janmark, Inc. v. Reidy, 132 F.3d 1200, 1202 (7th Cir.1997)). Given the state's broad application of the effects test, Cope's control over its subsidiaries, and Chinook's sales in the forum, jurisdiction over Cope can be found under the effects test in Illinois.
Kansas also recognizes the "effects test," but requires a more particularized inquiry as to whether the defendant purposely directed its tortious actions at Kansas. See, e.g., Wempe v. Sunrise Medical HHG, Inc., 61 F.Supp.2d 1165 (D.Kan. 1999). Following the Tenth Circuit's analysis, courts in that jurisdiction examine "prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing." Id. at 1170 (quoting Far West Capital, Inc. v. Towne, 46 F.3d 1071, 1079 (10th Cir.1995) (quoting Burger King Corp. v. Rudzewicz, 471 U.S. 462, 479, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985), and noting that the Burger King framework is useful in an effects test analysis)). Courts further examine "the contacts created by the out-of-state defendant in committing the alleged tort". Id. at 1079-80.
As this Court has previously recognized, Chinook engaged in substantial sales of price-fixed choline in Kansas during the years 1993-1997. See UCB Op. at 21 (citing Purchase Orders from Hill's Pet Nutrition in Kansas to Chinook Group in Canada). Chinook's actions were purposefully directed at Kansas, and Chinook and Cope knew that the prices at which such sales took place were fixed as part of the conspiracy. Further, while "[e]ven a single purposeful contact may be sufficient to meet the minimum contacts standard when the underlying proceeding is directly related to that contact," Wempe, 61 F.Supp.2d at 1170, Chinook's sales to Hill's Pet continued over a four year period and would have necessitated numerous contacts with the forum.
*33 Cope provides no direct rebuttal to plaintiffs' claims that jurisdiction may be found in either forum under the effects test theory, outside of its arguments that it was not in control of Chinook, and never directly conducted business in either Illinois or Kansas. However, the Court has already found that Cope sufficiently dominated and controlled Chinook to impute Chinook's activities to Cope. The Court therefore finds that it is foreseeable that there would be adverse consequences felt in Kansas as the result of Chinook's sales of price-fixed choline to purchasers within the State, making Cope subject to Kansas jurisdiction. In summary, personal jurisdiction against Cope is proper in Illinois based upon its broad application of the effects test, and in Kansas based on Chinook's sales of price-fixed choline chloride products in Kansas over a four year period.

4. Long-Arm Statutes
Plaintiffs contend that, in addition to the forgoing bases for personal jurisdiction, Cope would be subject to jurisdiction under the Kansas Long-Arm statute, and Cope, Copland and Stayner would be subject to jurisdiction under the Minnesota Long-Arm Statute. Determinations of jurisdiction under long-arm statutes require a two step process which begins with a consideration of the statute in question. Under the second step of the inquiry, the Court must consider whether jurisdiction may be asserted over the defendants consistent with due process. Since Kansas and Minnesota construe their states' respective long-arm statutes to authorize the exercise of jurisdiction to the full extent allowable under the Due Process Clause,[12] the inquiry becomes one of determining whether the defendant's actions satisfy the minimum contacts required by due process, so that "maintenance of the suit does not offend traditional notions of fair play and substantial justice." International Shoe Co. v. State of Washington, 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945). The Court must be assured that defendant's contacts with the forum "are such that he should reasonably anticipate being hauled into court there." World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 297, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980).

a. Kansas
The relevant portions of the Kansas statute allow for jurisdiction over anyone who, "[i]n person or through an agent or instrumentality" commits certain acts, including: "(1) [transaction of business within th[e] state; or (2)[c]ommission of a tortious act within th[e] state." Kan. Stat. Ann. § 60-308(b) (2001). The Kansas statute is construed "liberally so as to allow jurisdiction to the full extent permitted by the due process clause." Wempe v. Sunrise Medical HHG, Inc., 61 F.Supp.2d 1165, 1167-68 (D.Kan.1999).
The Kansas statute also includes an "agent or instrumentality" provision, which courts read broadly "to encompass nonresidents who (1) control or direct the instrumentality's acts from which the claim arises, or (2) "purposefully seek[] and foreseeably benefitf ] from [an] active relationship with another entity that has transacted business in the forum that gives rise to [the] claim." Battenfeld of America Holding Co., Inc. v. Baird Kurtz, & Dobson, 45 F.Supp.2d 1109, 1114 (D.Kan.1999) (quoting Energy Reserves Group, Inc. v. Superior Oil Co., 460 F.Supp. 483, 514 (D.Kan.1978)).
*34 Should the Court find that plaintiffs have satisfied the requirements for the Kansas statute, the Court must next turn to the second step of the inquiry, and consider whether the exercise of jurisdiction comports with due process. Given that Kansas finds its statute to be extend to the limits of the Due Process Clause, the Court may turn immediately to the Due Process inquiry.
As stated earlier, the Court finds that plaintiffs have presented adequate evidence of numerous acts performed in Kansas by Cope and its subsidiaries to support their allegations of jurisdiction over Cope in that forum. The relevant contacts are discussed above in the conspiracy theory and effects test sections of this Opinion. Moreover, the Court finds that defendant should have reasonably anticipated being hauled into court in Kansas to defend allegations of damages resulting from Chinook's four-year history of sales of pricefixed choline chloride to Plaintiff Hill's Pet. Accordingly, the Court finds that jurisdiction based upon the Kansas long-arm statute is appropriate in this case considering the ongoing contacts that Cope and its subsidiaries have with Kansas. See Wempe, 61 F.Supp.2d at 1167-68.[13]
Defendant Cope argues that a finding of jurisdiction serves neither the "convenience of the parties" nor "judicial economy". Cope KS Reply at 4-5. Even if Peter Copland and Patrick Stayner, as Chinook's officers and directors, controlled Chinook's choline chloride activities, the Defendant reasons, there is no reason to reach beyond Chinook Group Inc. Id. Chinook Group Inc. is the operational entity that has conceded jurisdiction and that has pled guilty to price fixing, and thus plaintiffs will have redress for their injuries without burdening Cope with defending itself in Kansas. Cope KS Mem. at 11-12.
However, based upon Chinook's extensive contacts and the evidence in the record, the Court finds jurisdiction to be "reasonable" based upon the factors set forth in Asahi Metal Industry Co. v. Superior Ct, 480 U.S. 102, 107 S.Ct. 1026, 94 L.Ed.2d 92 (1987) and therefore non-offensive to "traditional notions of fair play and substantial justice" as required by the Due Process Clause. Noting that courts should exercise care when asserting jurisdiction over foreign nationals, the Asahi Court directed courts to consider: (1) the burden on the defendant, (2) the interests of the forum State, (3) the plaintiffs interest in obtaining relief, (4) the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and (5) the shared interest of the several states in furthering fundamental substantive social policies. Asahi Metal Industry, 480 U.S. at 113,107 S.Ct. 1026. Given that the Chinook defendants have stipulated to doing business in each of the relevant fora, including Kansas, the interests of both the plaintiffs and the states in receiving redress in their fora of choice, and the particular importance of promoting enforcement of antitrust laws, the Court finds that the burden to the Cope is outweighed, and asserting jurisdiction is reasonable.
Finally, because the U.S. subsidiaries have stipulated to doing business in Kansas and the Court has found that Cope "controls" these subsidiaries, plaintiffs have also satisfied subsection (1) of the *35 Kansas long-arm statute.[14]See Kan. Stat. Ann. § 60-308(b)(1) (2001) (providing for jurisdiction over anyone transacts business in Kansas either personally or through an agent). In conclusion, the Court finds that Cope is subject to jurisdiction in Kansas under the state's long arm statute, and that jurisdiction over Cope may be found consistent with the requirements of due process.

b. Minnesota
The Minnesota long-arm statute allows the Court to assert personal jurisdiction over a foreign individual or corporation if, in person or through an agent, the foreign corporation or nonresident individual (a) commits any act in Minnesota causing injury or property damage, or (b) commits any act outside Minnesota causing injury or property damage, subject to the following exceptions when no jurisdiction can be found: (1) Minnesota has no substantial interest in providing a forum; or (2) the burden placed on the defendant by being brought under the state's jurisdiction would violate fairness and substantial justice. Minn.Stat. § 543.19.
Class Plaintiffs contend that Cope is subject to general jurisdiction in Minnesota because of their "continuous and systematic" contacts with the forum. Further, Class Plaintiffs point out that the Court found that contacts between UCB's subsidiaries and alleged co-conspirators with Minnesota were sufficient to jurisdiction under the statute, given that the Court had found sufficient evidence of UCB's control over its subsidiaries and its involvement in the alleged all-vitamins conspiracy. Class Pl's Reply at 14-15 (citing UCB Op. at 32). Indeed, while the Court found that UCB's direct contacts with Chinook were insufficient to constitute "continuous and systematic" contact with Minnesota, see UCB Op. at 31-32, no such finding would necessarily be required with respect to Cope or with respect to Copland and Stayner, due to the presence of the Chinook entity in Minnesota and the evidence of numerous contacts of both the corporation and the individuals with Chinook employee Kennedy and other Chinook employees at the Minnesota plant related to the conspiracy or to price-fixed choline.[15] With respect to Cope, as Class Plaintiffs suggest, the finding of jurisdiction is further buttressed by the Court's conclusion that there is sufficient evidence of Cope's control over its subsidiaries and of its involvement in the conspiracy to support jurisdiction based on contacts of its subsidiaries and its co-conspirators in Minnesota. Further, the Court is satisfied that these contracts are sufficient to satisfy due process concerns. Accordingly, the Court finds that Cope, Copland and Stayner are subject to jurisdiction in Minnesota under the Minnesota long-arm statute.

B. Severance and Transfer of Claims brought in the District of Columbia
Defendant rightfully contends, and Class Plaintiffs do not dispute, that the Chinook Defendants' contacts with the District of Columbia are insufficient to *36 personal jurisdiction, even in light of the fact that the Court finds that it can attribute to Cope the activities of its Minnesota subsidiaries. The only contacts any of the Chinook Defendants have had with the District of Columbia are attendance at one or more anti-dumping hearings which took place in the District, see Chinook Mot. at 5, which fall within the government contacts exception. See Investment Co. Institute v. United States, 550 F.Supp. 1213, 1216 (D.D.C.1982) (contacts which arise from "the unique character of the District as the seat of national government" and therefore implicate "the need for unfettered access to federal departments and agencies" are covered by the government contacts exception); see also Fandel v. Arabian American Oil Co., 345 F.2d 87, 88-89 (D.C.Cir. 1965) (government contacts exception applied where defendant maintained a fiveperson office in the District for purposes of handling diplomatic and regulatory issues). Moreover, Class Plaintiffs do not assert that personal jurisdiction may be found pursuant to these contacts.
Instead, to cure this jurisdictional deficiency, Class Plaintiffs request that the court sever claims against the Chinook Defendants and transfer the claims pursuant to Rule 21 of the Federal Rules of Civil Procedure and Sections 1404(a) or 1406(a) of the United States Code.[16] Rule 21 provides for severance of parties and/or claims "at any stage of the action and on such terms as are just." Fed.R.Civ.P. 21. Section 1404(a) provides that "[f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." 28 U.S.C. § 1404(a). Finally, Section 1406(a) provides that "[t]he district court of a district in which is filed a case laying venue in the wrong division or district shall dismiss, or if it be in the interest of justice, transfer such case to any district or division in which it could have been brought." Id. § 1406(a).
Courts apparently disagree with respect to whether one of the two sections of the U.S.Code is most appropriate in circumstances like those presented in the instant motions, or whether transfer is actually authorized by the reading of the provisions together. See, e.g. McFarlane v. Esquire Magazine, 74 F.3d 1296, 1301 (D.C.Cir. 1996) (describing the precedent as a "nearly hopeless muddle"); Blair v. Norwegian Caribbean Lines, 622 F.Supp. 21, 25 n. 6 (D.D.C.1985) (collecting cases). However, regardless of the section applied, courts agree that these statutes provide a method of severing and transferring claims that would otherwise be dismissed for failure of venue or jurisdiction where transfer would more accurately serve "the interest of justice." Blair, 622 F.Supp. at 24; Broadcast Capital, Inc. v. Molnar, No. 93-1240, 1993 WL 594355, at *2 (D.D.C.1993). In addition to a consideration of the interests of justice, which is relevant under both sections, section 1404(a) also directs the court to consider the convenience of the parties and the witnesses. McFarlane, 74 F.3d at 1301. Finally, contrary to the Chinook Defendants' argument, a lack of personal *37 jurisdiction on the part of the transferor court does not prevent transfer under these sections to any jurisdiction where the claims might have originally been brought. Blair, 622 F.Supp. at 24; Bayles v. K-Mart Corp. 636 F.Supp. 852, 856-75 & n. (D.D.C.1986) (collecting cases and noting their application to 1404(a) of the principle announced in Goldlawr, Inc. v. Heiman, 369 U.S. 463, 466, 82 S.Ct. 913, 8 L.Ed.2d 39 (1962), that the "interest of justice" are sufficiently broad to authorize transfer under 1406(a) despite lack of personal jurisdiction).
Analyzing the current facts with respect to the foregoing requirements, the Court finds that severance and transfer of the Class Plaintiffs' claims to the District of Minnesota is appropriate under either section 1404(a) or 1406(a), or both. This conclusion is supported by a number of factors generally considered in transfer under section 1404(a). Specifically, the action could have been brought in the District of Minnesota, important Chinook evidence and witnesses are located there, and all of the Chinook Defendants are subject to jurisdiction in Minnesota. Further, many acts of anticompetitive conduct took place in Minnesota through Chinook's sale of price-fixed choline, and Minnesota purchasers were harmed by the anticompetitive conduct of Chinook entities and their co-conspirators. Finally, transfer to the District of Minnesota is at the request of the Class Plaintiffs, obviating concerns for and deference to plaintiffs' original choice of forum which arise where defendants' move for transfer. See, e.g., Blair, 622 F.Supp. at 24 & n. 7 (considering similar factors under § 1404(a)); Bayles, 636 F.Supp. at 856 (same).
Severance and transfer will also serve the interests of justice, as required under both sections of the code. Severance and transfer will avoid the potential loss of certain of the Class Plaintiffs' claims which could be barred by a statute of limitations, "merely because [they] made a mistake in thinking that the [defendants] could be `found' or that they `transact ... business' in the [district in which claims were filed]". Goldlawr, 369 U.S. at 466, 82 S.Ct. 913 (describing loss of claims as a `typical example' of the injustice section 1406(a) intended to address). While the Chinook Defendants argue that this is a dilemma of the Class Plaintiffs' own making, given that Class Plaintiffs were on notice regarding possible jurisdictional issues, the Court is unpersuaded that this would inevitably lead to a failure under the transfer provisions. Further, any delay on the part of Class Plaintiffs is understandable given that it was not clear where jurisdiction would be appropriate due to significant fights over discovery. The Court is also persuaded that severance and transfer would provide the most "expeditious and orderly adjudication" of the claims against the defendants, and would avoid costs and delays that would be associated with Class Plaintiffs refiling of claims. The Court therefore grants Class Plaintiffs' Motion to Sever and Transfer Claims against the Chinook Defendants pursuant to Sections 1404(a) and 1406(a), rendering the Chinook Defendants' Motion to Dismiss for Lack of Personal Jurisdiction moot.

III. CONCLUSION
In conclusion, the Court finds that corporate defendant Cope is subject to personal jurisdiction: (1) in Illinois, Kansas, and Minnesota under § 12 of the Clayton Act; (2) in each of the states pursuant to the conspiracy theory of jurisdiction; (3) in Illinois and Kansas under the effects test; and (4) in Kansas under the state's longarm statutes. The Court further finds that individual defendants Peter Copland and Patrick Stayner are subject to jurisdiction in Minnesota under (1) the conspiracy theory of jurisdiction; and (2) the Minnesota long-arm statute.
*38 The Court also finds that a severance of Class Plaintiffs' claims against Cope, Chinook Group Limited, Chinook Group, Inc., Peter Copland and Patrick Stayner, and transfer of such claims to the District of Minnesota, would be for the convenience of the parties and the witnesses, and in the interests of justice. Accordingly, defendant's Motions to Dismiss are denied or rendered moot, and Class Plaintiffs' Motion to Sever and Transfer is granted. An order will accompany this Opinion.

ORDER

Re: Cope Investments Motions to Dismiss
In accordance with the accompanying Memorandum Opinion, it is hereby
ORDERED that defendant Cope Investments Limited's Motions to Dismiss it as a defendant from the Archer Daniels Midland v. F. Hoffman-Laroche and Hill's Pet Nutrition v. F. Hoffman-Laroche actions pursuant to Fed.R.Civ.P. 12(b)(2), for lack of personal jurisdiction are DENIED; it is further hereby
ORDERED that the Motion to Dismiss brought by defendants Cope Investments Limited, Chinook Group Limited, Chinook Group, Inc., Peter Copland and Patrick Stayner as to the Animal Science Products v. Chinook Group, Ltd. Class Action pursuant to Fed.R.Civ.P. 12(b)(2), for lack of personal jurisdiction are DENIED AS MOOT; it is further hereby
ORDERED that Class Plaintiffs' Motion to Sever and Transfer to Minnesota Claims Against the Chinook Defendants pursuant to Fed.R.Civ.P. 21 and 28 U.S.C. §§ 1404(a) and 1406(a) is GRANTED.
SO ORDERED.
NOTES
[1] The Archer Daniels Midland v. Chinook Group, Ltd., et. al. action was filed in the U.S.C.A. ConstAmend. 5; K.S.A. 60-308(b)(1). Northern District of Illinois. In addition to defendant's motion, the record also includes the following: Cope Investments Limited's Memorandum in Support of Its Motion to Dismiss For Lack of Personal Jurisdiction [in Illinois] ("Cope IL Mem."); Plaintiff Archer Daniels Midland's Opposition to Defendant Cope Investments Limited's Motion to Dismiss for Lack of Personal Jurisdiction ("ADM Opp'n"); Cope Investments Limited's Reply Memorandum in Support of Its Motion to Dismiss For Lack of Personal Jurisdiction [in Illinois] ("Cope IL Reply"). The Hill's Pet Nutrition v. F. Hoffman-Laroche Ltd., et. al. action was filed in the District of Kansas. In addition to defendant's motion under consideration herein, the record also includes the following: Cope Investments Limited's Memorandum in Support of Its Motion to Dismiss For Lack of Personal Jurisdiction [in Kansas] ("Cope KS Mem."); Plaintiff Hill's Pet Nutrition, Inc.'s Response to Cope Investment Limited's Motion to Dismiss for Lack of Personal Jurisdiction ("Hill's Pet Opp'n") Cope Investments Limited's Reply Memorandum in Support of Its Motion to Dismiss For Lack of Personal Jurisdiction [in Kansas] ("Cope KS Reply").
[2] The Animal Science, v. Chinook Group, Ltd. Class Action was filed in the District of Columbia. The record with respect to the motion under consideration includes the following: Motion to Dismiss For Lack of Personal Jurisdiction ("Chinook Mot."); Class Plaintiffs' Response to the Chinook Defendants' Motion to Dismiss for Lack of Personal Jurisdiction ("Class Opp'n"); Chinook Defendants' Reply to Class Plaintiffs' Response to the Chinook Defendants' Motion to Dismiss for Lack of Personal Jurisdiction ("Chinook Reply").
[3] The record with respect to the final motion under consideration is as follows: Class Plaintiffs' Motion to Sever and Transfer to Minnesota Claims Against the Chinook Defendants ("Class Mot."); Chinook Defendants' Response to Class Plaintiffs' Motion to Sever and Transfer to Minnesota Claims Against the Chinook Defendants ("Chinook Opp'n"); Reply Memorandum in Support of Class Plaintiffs' Motion to Sever and Transfer to Minnesota Claims Against the Chinook Defendants ("Class Reply").
[4] The Court recognizes the Class Plaintiffs argument that a preponderance standard, or finding of jurisdiction "to a certainty" is unnecessary for the purposes of severance and transfer. See Class Reply at 10-11. The Court will not address this argument as the Court ultimately finds that Class Plaintiffs have established personal jurisdiction under the preponderance standard.
[5] Cope's subsidiaries do not challenge jurisdiction in: Kansas, see Cope KS Mem. at 11 n. 11; Illinois, see Cope IL Mem. at 12; or, Minnesota, see Chinook Opp'n at 6 n. 5.
[6] The Court notes that the parties attached many of the same or similar excerpts of depositions documentary evidence. In the interest of readability, the Court has chosen to cite to the pertinent Exhibit with reference to only one of the pleadings, and with no particular intention with respect to the pleading referenced.
[7] At issue in Bestfoods was a circuit split regarding the extent to which parent corporations could be found liable for subsidiary operating facilities under the Comprehensive Environmental Response, Compensation and Liability Act (CERCLA), and what form such analysis should take. See Bestfoods, 524 U.S. at 60, 118 S.Ct. 1876.
[8] See In re: Vitamins Antitrust Litig., 94 F.Supp.2d 26, 32-33 (D.D.C.2000); UCB Op. at *17.
[9] As noted in the UCB opinion, the Supreme Court has held that "[t]he unilateral activity of those who claim some relationship with a nonresident defendant cannot satisfy the requirement of contact with the forum State." UCB Op. at *18 (quoting Hanson v. Denckla, 357 U.S. 235, 253, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958)). To comport with due process under this theory, this Court must find some evidence that the imputed acts of the third party were authorized or undertaken for the benefit of defendant. See Grove Press, Inc. v. Angleton, 649 F.2d 121, 122-23 (2d Cir. 1981) (holding that to establish agency jurisdiction, alleged agent must act "for the benefit of, and under some control by, the nonresident principal"). Therefore, the Court must find that Cope actually participated in the conspiracy before it applies the conspiracy theory of jurisdiction.
[10] "For example, plaintiffs have produced evidence that the North American choline chloride producers sent fraudulent choline price increase notifications to choline purchasers in Illinois, misstating the reasons for the price increases, see, e.g., 9/13/94 Letter from DuCoa to Prince Agri Products, Inc. (App.l, Ex. 27); and DuCoa and Bioproducts sold more than $6,000,000 worth of choline chloride to several plaintiffs in Illinois based on the pricefixing agreement and rigged bids. Moreover, co-defendant and co-conspirator Akzo Nobel's wholly owned subsidiary, Akzo Nobel, Inc., maintains its principal place of business in Chicago, Illinois." UCB Op. at *18.
[11] Unlike other individual defendants employed by Chinook entities over whom this Court has considered personal jurisdiction. Defendants do not attempt to invoke the fiduciary shield doctrine with respect to Copland and Stayner. Compare Mem. Op. re Samuelson Motion to Dismiss, July 2, 2001, at *5-14 (denying a motion to dismiss based on the doctrine).
[12] See, e.g., Rostad v. On-Deck, Inc., 372 N.W.2d 717, 719 (Minn. 1985); Wempe v. Sunrise Medical HHG, Inc., 61 F.Supp.2d 1165, 1167-68 (D.Kan.1999).
[13] In Wempe, the court found sufficient minimum contacts through two phone calls to the forum where the defendant solicited and induced the plaintiff to rely on certain representations made during their telephone conversations, and fraudulently concealed his plans and intentions to misappropriate a proprietary design during the second, and where the defendant knew that the harm would occur in Kansas and where the harm did occur in the forum. Wempe, 61 F.Supp.2d at 1170-71.
[14] The Court declines to consider plaintiff's contention that Cope may also be reached through the alter-ego theory of jurisdiction which is available under Kansas law. As plaintiff points out, a finding of personal jurisdiction of a parent for the acts of a subsidiary under the Kansas long-arm statute does not require such a finding. See Energy Reserves Group, Inc. v. Superior Oil Co., 460 F.Supp. 483, 490 (D.Kan. 1978). Given that the Court has already considered plaintiff's Kansas law arguments, and found that Cope is subject to jurisdiction under the state long-arm statute, such an inquiry is redundant.
[15] The relevant contacts are discussed in particular depth in the section on Conspiracy Theory Jurisdiction, above.
[16] In their reply to the Chinook Defendants' Motion to Dismiss for lack of personal jurisdiction, Class Plaintiffs cite the decision of another MDL transferee judge who, under identical circumstances, refused to dismiss and transfer a case that would only be returned to the MDL forum given the enormous delay and expense involved. Class Reply at *2 (citing In re Towner Petroleum Co. Sec. Litig., 1986 U.S. Dist. Lexis 23473 at *47 (E.D. Pa. June 30, 1986)). However, the Supreme Court has subsequently made clear that district courts conducting multidistrict pretrial proceedings have no authority under 28 U.S.C. § 1407 to sever and transfer cases to themselves. Lexecon v. Milberg Weiss Bershad Hynes & Lerach, 523 U.S. 26, 118 S.Ct. 956, 140L.Ed.2d 62(1998).